Case No. 23-5343

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

COMMONWEALTH OF KENTUCKY

*Plaintiff-Appellant*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*

*Defendants-Appellees*

On Appeal from the United States District Court
for the Eastern District of Kentucky
Case No. 3:23-cv-00007

## COMMONWEALTH OF KENTUCKY'S
## MOTION FOR INJUNCTION PENDING APPEAL

Daniel Cameron
 *Attorney General*
Victor B. Maddox
 *Deputy Attorney General*
Matthew F. Kuhn
 *Solicitor General*
Harrison Gray Kilgore
Jenna M. Lorence
 *Assistant Solicitors General*

Office of Kentucky Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
Matt.Kuhn@ky.gov

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.......................................................................................ii

INTRODUCTION ..............................................................................................1

STATEMENT OF THE CASE ...........................................................................2

ARGUMENT ....................................................................................................8

  I. Kentucky is likely to succeed on the merits. ..............................................9

    A. Kentucky has standing..........................................................................9

    B. The Final Rule exceeds the Agencies' statutory authority..........................15

    C. The Final Rule is arbitrary and capricious......................................20

    D. The Final Rule raises constitutional concerns. ...........................20

  II. The Final Rule is causing irreparable harm.......................................21

  III. The equities and the public interest favor an injunction pending appeal. .22

CONCLUSION .................................................................................................23

CERTIFICATE OF COMPLIANCE ................................................................24

CERTIFICATE OF SERVICE .........................................................................25

ADDENDUM.....................................................................................................26

# TABLE OF AUTHORITIES

## Cases

*Bond v. United States*,
572 U.S. 844 (2014) ...................................................................................19

*Chase Bank USA, NA v. City of Cleveland*,
695 F.3d 548 (6th Cir. 2012) ........................................................................8

*City of Arlington v. FCC*,
569 U.S. 290 (2013) ...................................................................................15

*Commonwealth v. Beshear*,
981 F.3d 505 (6th Cir. 2020) ........................................................................8

*Commonwealth v. Biden*,
57 F.4th 545 (6th Cir. 2023) ............................................. 12, 14, 21, 22

*Czyzewski v. Jevic Holding Corp.*,
580 U.S. 451 (2017) ...................................................................................12

*Georgia v. Pruitt*,
326 F. Supp. 3d 1356 (S.D. Ga. 2018)..................................................5, 15, 21

*In re EPA*,
803 F.3d 804 (6th Cir. 2015) ........................................................................5

*In re U.S. Dep't of Def.*,
713 F. App'x 489 (6th Cir. 2018) ................................................................5

*Kentucky v. Biden*,
23 F.4th 585 (6th Cir. 2022) ................................................................*passim*

*Kentucky v. Yellen*,
54 F.4th 325 (6th Cir. 2022) ............................................. 11, 12, 13, 14

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .....................................................................................9

*Massachusetts v. EPA*,
549 U.S. 497 (2007) ...................................................................................10

*Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't*,
984 F.3d 477 (6th Cir. 2020) ........................................................................9

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
463 U.S. 29 (1983) ........................................................................... 20

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
138 S. Ct. 617 (2018) ........................................................................ 5

*Nken v. Holder*,
556 U.S. 418 (2019) .......................................................................... 22

*North Dakota v. EPA*,
127 F. Supp. 3d 1047 (D.N.D. 2015) ................................................ 5

*Pascua Yaqui Tribe v. EPA*,
557 F. Supp. 3d 949 (D. Ariz. 2021) ................................................ 5

*Rapanos v. United States*,
547 U.S. 715 (2006) .................................................................. *passim*

*Sackett v. EPA*,
No. 21-454 (U.S.) ............................................................................. 6

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*,
531 U.S. 159 (2001) ................................................................. *passim*

*Stryker Emp. Co., LLC v. Abbas*,
60 F.4th 372 (6th Cir. 2023) ........................................................... 9

*Tarrant Reg'l Water Dist. v. Herrmann*,
569 U.S. 614 (2013) .................................................................... 9, 12

*Texas v. EPA*,
No. 3:23-cv-17, 2023 WL 2574591 (S.D. Tex. Mar. 19, 2023) .......... *passim*

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994) .......................................................................... 22

*Tiger Lily, LLC v. U.S. Dep't of Hous. & Urb. Dev.*,
992 F.3d 518 (6th Cir. 2021) ........................................................... 8

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) .......................................................................... 2

*United States v. Riverside Bayview Homes, Inc.*,
474 U.S. 121 (1985) .......................................................................... 16

*West Virginia v. EPA*,
   142 S. Ct. 2587 (2022) ............................................................19

*West Virginia v. EPA*,
   No. 3:23-cv-32, 2023 WL 2914389 (D.N.D. Apr. 12, 2023)........................*passim*

**Statutes**

33 U.S.C. §§ 1341–46........................................................................2

33 U.S.C. § 1251 ........................................................................ 2, 19

33 U.S.C. § 1311 ........................................................................ 2, 10

33 U.S.C. § 1313 ...................................................................... 10, 14

33 U.S.C. § 1315 ........................................................................ 3, 10

33 U.S.C. § 1319 ..............................................................................3

33 U.S.C. § 1341 ............................................................................10

33 U.S.C. § 1342 ...................................................................... 2, 3, 10

33 U.S.C. § 1344 ..............................................................................2

33 U.S.C. § 1362 ........................................................................ 2, 15

Ky. Rev. Stat. § 224.1-010 ..................................................................2

Ky. Rev. Stat. §§ 224.16-040 to -090 ....................................................10

Ky. Rev. Stat. §§ 224.70-100 to -150 ....................................................10

**Other Authorities**

51 Fed. Reg. 41,206 (Nov. 13, 1986).....................................................3

53 Fed. Reg. 20,764 (June 6, 1988).......................................................3

86 Fed. Reg 69,372 (Dec. 7, 2021) ........................................................6

*Clean Water Rule: Definition of "Waters of the United States,"* 80 Fed. Reg. 37,054
   (June 29, 2015)..........................................................................5

*Definition of "Waters of the United States"—Recodification of Pre-Existing Rules*, 84 Fed.
   Reg. 56,626 (Oct. 22, 2019).............................................................5

*EPA & U.S. Army Corps of Eng'rs, Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in* Rapanos v. United States *&* Carabell v. United States (Dec. 2, 2008) ........................................................................................................4

*Navigable Waters Protection Rule: Definition of "Waters of the United States,"* 85 Fed. Reg. 22,250 (Apr. 21, 2020) ........................................................................5

*Revised Definition of "Waters of the United States,"* 88 Fed. Reg. 3004 (Jan. 18, 2023) ................................................................................................................*passim*

**Rules**

Fed. R. App. P. 8 ........................................................................................................8

**Regulations**

33 C.F.R. § 328.3 (2015) ............................................................................................5

40 C.F.R. § 130.3 ......................................................................................................10

40 C.F.R. § 130.7 .................................................................................................10, 14

40 C.F.R. § 131.4 ......................................................................................................10

40 C.F.R. § 19.4 ..........................................................................................................3

40 C.F.R. § 230.3 (2015) ............................................................................................5

## INTRODUCTION

The Commonwealth of Kentucky regulates its lands and waters to preserve its natural beauty, protect its citizens, and ensure the effective use of its resources. The Clean Water Act (CWA) expressly recognizes Kentucky's primacy over its waters while granting the Environmental Protection Agency and the Army Corps of Engineers (the Agencies) jurisdiction over only "navigable waters"—defined as "the waters of the United States." But the recently issued *Revised Definition of "Waters of the United States,"* 88 Fed. Reg. 3004 (Jan. 18, 2023) (the Final Rule), unlawfully upsets this necessary balance.

The Final Rule is already preliminarily enjoined in 26 States. The district court, however, refused to grant such relief to Kentucky because it found that the Commonwealth lacks standing to challenge the Final Rule. But this Court's recent standing decisions establish that Kentucky has standing both as a sovereign with interests in its waters and as a regulator facing compliance costs. And once standing is established, the merits of this case are straightforward, as two district courts have now held. Among other things, the Final Rule effectively reads the word "navigable" out of the CWA and impermissibly expands Justice Kennedy's separate opinion from *Rapanos*. On top of that, the Final Rule is arbitrary and capricious and raises constitutional concerns. And because all other relevant

1

factors support relief, the Court should grant Kentucky an injunction pending appeal.

## STATEMENT OF THE CASE

**1.** States have "traditional and primary power over land and water use." *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001) (*SWANCC*). In 1972, Congress passed the CWA, which establishes a cooperative federalism approach to water regulation. 33 U.S.C. § 1251(a). Key here, the CWA affirms States' "primary responsibilities and rights" over their "land and water resources." *Id.* § 1251(b). To this end, Kentucky enforces a comprehensive scheme for regulating "waters of the Commonwealth." *See, e.g.*, Ky. Rev. Stat. § 224.1-010(32). Meanwhile, the CWA grants the Agencies primary authority to regulate "navigable waters," defined as "the waters of the United States." 33 U.S.C. §§ 1341–46, 1362(7).

The distinction between CWA jurisdictional waters and not matters. Anyone who wants to discharge certain materials into a jurisdictional water needs a federal permit. *See* 33 U.S.C. §§ 1311(a), 1342, 1344. Obtaining such a permit is expensive, and approval can take years. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 594–95 (2016). And noncompliance carries civil and criminal liability. 33 U.S.C. § 1319(c); 40 C.F.R. § 19.4. Kentucky helps the Agencies

2

implement the CWA's permitting program, 33 U.S.C. § 1342(b), and is statutorily required to monitor and report on CWA jurisdictional waters within its borders, *id.* § 1315(b)(1). As a result, what counts as "waters of the United States" matters quite a bit to Kentucky—both from a sovereignty perspective and a regulatory one.

**2.** The Agencies have a long history of unlawfully using the CWA to claim more jurisdiction for themselves at the States' expense. In the 1980s, the Agencies defined their jurisdiction to include waters used in interstate commerce, which included waters that serve as a habitat for migratory birds. 51 Fed. Reg. 41,206 (Nov. 13, 1986); 53 Fed. Reg. 20,764 (June 6, 1988). But in *SWANCC*, the Court found that went too far. 531 U.S. at 164–66. The Agencies had "read[] the term 'navigable waters' out of the statute" by asserting jurisdiction over "nonnavigable, isolated, intrastate waters" that migratory birds used as a habitat. *Id.* at 172. And accepting the Agencies' position would have raised "significant" constitutional concerns and allowed "federal encroachment upon a traditional state power." *Id.* at 172–74.

Five years later, the Supreme Court handed the Agencies another CWA loss by rejecting their jurisdictional claim over intrastate wetlands that were too far removed from traditional jurisdictional waters. *Rapanos v. United States*, 547 U.S.

715 (2006). Justice Scalia's plurality opinion limited "navigable waters" to only "relatively permanent, standing or continuously flowing bodies of water" and those waters with a "continuous surface connection" to such relatively permanent waters. *Id.* at 739–42 (plurality op.). "Wetlands with only an intermittent, physically remote hydrologic connection" are not jurisdictional. *Id.* at 742.

Writing for only himself, Justice Kennedy determined that the Agencies' jurisdiction extends to only navigable-in-fact waters or waters "that could reasonably be so made" and to secondary waters with a "significant nexus" to these traditional navigable waters. *Id.* at 759 (Kennedy, J., concurring). To satisfy that nexus, secondary waters must "significantly affect the chemical, physical, and biological integrity of" navigable-in-fact waters. *Id.* at 780. But the effects of the wetlands in *Rapanos* on navigable waters were too speculative or insubstantial to be "fairly encompassed by the term 'navigable waters.'" *Id.*

After *Rapanos*, the Agencies issued non-binding guidance. EPA & U.S. Army Corps of Eng'rs, *Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in* Rapanos v. United States *&* Carabell v. United States (Dec. 2, 2008), https://perma.cc/U6CM-FRRM. The "*Rapanos* Guidance" asserted per se jurisdiction over certain categories of waters, like traditional navigable waters and relatively permanent, non-navigable tributaries of such waters. *Id.* at 1. For certain

4

other waters, like non-navigable tributaries that are not relatively permanent, the Agencies asserted case-by-case jurisdiction if those waters have a "significant nexus with a traditional navigable water." *Id.*

In 2015, the Agencies issued a formal rule redefining "waters of the United States." *Clean Water Rule: Definition of "Waters of the United States,"* 80 Fed. Reg. 37,054 (June 29, 2015) (2015 Rule). The 2015 Rule was expansive. *See generally* 33 C.F.R. § 328.3(a), (c) (2015); 40 C.F.R. § 230.3(o) (2015). Indeed, too expansive, as multiple courts enjoined it and this Court stayed its implementation. *See In re EPA*, 803 F.3d 804, 809 (6th Cir. 2015), *order vacated by In re U.S. Dep't of Def.*, 713 F. App'x 489, 490 (6th Cir. 2018), *in light of Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617 (2018); *Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1370 (S.D. Ga. 2018); *North Dakota v. EPA*, 127 F. Supp. 3d 1047, 1060 (D.N.D. 2015). The Agencies eventually rescinded the 2015 Rule. *Definition of "Waters of the United States"—Recodification of Pre-Existing Rules*, 84 Fed. Reg. 56,626 (Oct. 22, 2019).

So the pre-2015 regime remained in effect until the Agencies issued the *Navigable Waters Protection Rule: Definition of "Waters of the United States,"* 85 Fed. Reg. 22,250 (Apr. 21, 2020) (NWPR). But the NWPR was also challenged in court and eventually vacated. *See, e.g., Pascua Yaqui Tribe v. EPA*, 557 F. Supp. 3d 949, 957 (D. Ariz. 2021). The Agencies then returned to the pre-2015 regime.

**3.** The Final Rule is the Agencies' latest attempt at defining "waters of the United States." And they issued it while that exact question is pending before the Supreme Court. *Sackett v. EPA*, No. 21-454 (U.S.) (argued Oct. 3, 2022). The Agencies published their proposed rule in December 2021, 86 Fed. Reg 69,372 (Dec. 7, 2021), which Kentucky opposed in a comment, Comment, R.1-3, PageID#264–75. But rather than wait for *Sackett*, the Agencies charged ahead and published the Final Rule, which became the "law of the land" on March 20, 2023. Hr'g Tr., R.45, PageID#2042.

The Final Rule generally includes five categories of jurisdictional waters: traditional waters,[1] jurisdictional impoundments,[2] jurisdictional tributaries,[3] jurisdictional adjacent wetlands,[4] and other intrastate jurisdictional waters.[5] For the last three categories, the Final Rule allows jurisdiction to be established under either the *Rapanos* plurality's relatively permanent standard or Justice Kennedy's

---

[1] These are traditional navigable waters, territorial seas, and interstate waters and wetlands. 88 Fed. Reg. at 3143.

[2] These are impoundments of "waters of the United States." *Id.*

[3] These are tributaries to either traditional waters or jurisdictional impoundments. *Id.*

[4] These are wetlands adjacent to either a qualifying traditional water, jurisdictional impoundment, or jurisdictional tributary. *Id.*

[5] These are intrastate lakes and ponds, streams, or wetlands not identified in the previous categories that meet either the relatively permanent standard or the significant-nexus standard. *Id.* at 3143–44.

significant-nexus standard. 88 Fed. Reg. at 3143. So for example, "relatively permanent, standing or continuously flowing" tributaries to navigable waters are jurisdictional under the Final Rule. *Id.* So are any tributaries that "either alone or in combination with similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity" of traditional waters. *Id.*

The Final Rule's either-or-*Rapanos* standard "replace[d] the interstate commerce test," which considered jurisdiction over non-navigable, intrastate waters "based solely on whether the use, degradation, or destruction of the water could affect interstate or foreign commerce." *Id.* at 3029. The Agencies admit, as they must, that the Final Rule sweeps new waters into the CWA jurisdictional bucket. *See* Opp'n to PI, R.31, PageID#975; H'rg Tr., R.45, PageID#1993–96, 2006–10.

**4.** Before the Final Rule took effect, Kentucky sued and sought a preliminary injunction.[6] Compl., R.1, PageID#1–40; PI Mot., R.10, PageID#372–403. Although two other courts considering challenges brought by 26 sister States have now preliminarily enjoined the Final Rule, *West Virginia v. EPA*, No. 3:23-cv-32, 2023 WL 2914389 (D.N.D. Apr. 12, 2023); *Texas v. EPA*,

---

[6] Several private plaintiffs sued at the same time. *Ky. Chamber of Commerce v. EPA*, No. 3:23-cv-00008 (E.D. Ky.). The private plaintiffs have also appealed from the decision below. *Ky. Chamber of Commerce v. EPA*, No. 23-5345 (6th Cir.).

No. 3:23-cv-17, 2023 WL 2574591 (S.D. Tex. Mar. 19, 2023), the court below
denied Kentucky's motion, concluding that the Commonwealth lacks standing to
challenge the Final Rule, Op. & Order, R.51, PageID#2120–41. And the district
court sua sponte dismissed Kentucky's complaint without prejudice.[7] *Id.* at
PageID#2141.

Four days later, Kentucky sought an emergency injunction pending appeal
in district court. IPA Motion, R.52, PageID#2142–55. Yesterday, Kentucky
appealed. It now seeks an injunction pending appeal.[8]

## ARGUMENT

Whether to grant an injunction pending appeal turns on four questions: Is
Kentucky likely to succeed on the merits? Will Kentucky be irreparably injured

---

[7] The district court erred in this respect. *Chase Bank USA, NA v. City of Cleveland*,
695 F.3d 548, 558 (6th Cir. 2012) ("Before dismissing a compliant sua sponte,
even if the dismissal is without prejudice, the court must give notice to the
plaintiff.").

[8] As directed by Federal Rule of Appellate Procedure 8(a)(1)(C), the
Commonwealth first sought relief in district court, explaining that ongoing
irreparable injuries require a prompt resolution. IPA Motion, R.52,
PageID#2142–55. And to speed matters along, the Commonwealth waived its
right to file a reply brief. Notice, R.58, PageID#2318–20. As of this filing, the
district court has not ruled, effectively denying the requested relief and making
waiting any longer impracticable. *See Tiger Lily, LLC v. U.S. Dep't of Hous. & Urb.
Dev.*, 992 F.3d 518, 521 n.2 (6th Cir. 2021); *Commonwealth v. Beshear*, 981 F.3d 505,
508 (6th Cir. 2020).

absent relief? Will an injunction injure other parties? And does the public interest favor an injunction? *See Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't*, 984 F.3d 477, 479 (6th Cir. 2020). The answer to each question favors injunctive relief here.

## I.    Kentucky is likely to succeed on the merits.

To show a likelihood of success on the merits, "it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Stryker Emp. Co., LLC v. Abbas*, 60 F.4th 372, 385 (6th Cir. 2023) (cleaned up). Kentucky is very likely to succeed on the merits.

### A.    Kentucky has standing.

To establish standing, Kentucky must show an actual or imminent injury in fact fairly traceable to the Final Rule that the Court can redress. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

**1.** When it comes to its lands and waters, Kentucky wears several hats. As a sovereign, Kentucky has primary power over resources within its borders. *SWANCC*, 531 U.S. at 174. Indeed, the "power to control navigation, fishing, and other public uses of water" is "an essential attribute of [Kentucky's] sovereignty." *Tarrant Reg'l Water Dist. v. Herrmann*, 569 U.S. 614, 631 (2013)

(cleaned up). And in regulating its waters, Kentucky has established a comprehensive regime. *See, e.g.*, Ky. Rev. Stat. §§ 224.70-100 to -150, 224.16-040 to -090. So Kentucky has, and actively exercises, a sovereign interest in regulating its waters.

Kentucky also helps the Agencies implement federal water regulations. For example, Kentucky must enact Water Quality Standards (WQS) for "waters of the United States" within the Commonwealth. 33 U.S.C. §§ 1311(b)(1)(C), 1313(e)(3)(A); 40 C.F.R. §§ 130.3, 131.3(i), 131.4(a). It must monitor those waters and act if they fall short of WQS. 33 U.S.C. § 1313(c); 40 C.F.R. § 130.7. Kentucky also must prepare and submit to the EPA a biennial water-quality report describing the "quality of all navigable waters" in the Commonwealth and analyzing how well individual waters support wildlife and recreational activities. 33 U.S.C. § 1315(b)(1)(A). Kentucky also helps issue CWA certifications, *id.* § 1341(a), and approve discharge permit applications, *id.* § 1342(b).

The Final Rule's re-definition of "waters of the United States" injures Kentucky's sovereign interests and imposes compliance costs on it. Kentucky therefore has standing *both* as a sovereign and as a regulator.

**2.** Recent decisions from this Court make the standing analysis here easy, particularly given the "special solicitude" afforded to Kentucky. *See Massachusetts v. EPA*, 549 U.S. 497, 520 (2007).

In *Kentucky v. Biden*, several States challenged a mandate that federal contractors ensure their employees receive the COVID-19 vaccine. 23 F.4th 585, 589–90 (6th Cir. 2022) (*Biden*). The Court recognized that States "have sovereign interests to sue when they believe that the federal government has intruded upon areas traditionally within states' control." *Id.* at 598. So the Court held that the States had standing to vindicate their sovereign interests because the challenged mandate "plausibly" intruded on an area traditionally left to them. *Id.* at 598–99, 601–02.

The Court reaffirmed this sovereign-authority framework in *Kentucky v. Yellen*, 54 F.4th 325, 335–38 (6th Cir. 2022) (*Yellen*). There, two States challenged a federal tax mandate. The States initially had standing as sovereigns in part because the mandate "at least arguably" affected their prerogative "to control their own internal taxation policies" and they "illustrated a credible threat of enforcement." *See id.* at 336–37; *see also id.* at 360–62 (Nalbandian, J., concurring in part and dissenting in part).

11

Both *Biden* and *Yellen* also recognized that the object of federal action ordinarily has standing to challenge it, particularly because of compliance costs. For example, in *Biden*, Kentucky independently had standing as a government contractor subject to the mandate given the "virtual certainty that [Kentucky] [would] either bid on new federal contracts or renew existing ones." 23 F.4th at 594–95; *see also Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023) (*Biden II*) (discussing the compliance costs of the mandate). Likewise, because complying with the tax mandate in *Yellen* required "undertak[ing] compliance efforts," the Court found an injury in fact. 54 F.4th at 342–43. Indeed, "compliance costs are a recognized harm for purposes of Article III." *Id.* at 342.

**3.** Just like the mandates in *Biden* and *Yellen*, the Final Rule "intrude[s] upon an area traditionally left to the states." *Biden*, 23 F.4th at 599. By admittedly expanding jurisdictional waters under the CWA, the federal government now exercises control over waters that were previously regulated by Kentucky, infringing on "an essential attribute of [Kentucky's] sovereignty." *Tarrant Reg'l Water Dist.*, 569 U.S. at 631 (citation omitted). And it makes no difference for standing purposes that the Agencies (wrongly) believe that their intrusion on Kentucky's sovereignty is small. *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451,

12

464 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'").

Kentucky is a wet state, with "more navigable miles of water than any other state except Alaska."[9] So given the Agencies' admission that new waters will be jurisdictional under the Final Rule, it is beyond merely "plausibl[e]" that the federal government has intruded on a traditional state prerogative. *Biden*, 23 F.4th at 599; *see also Yellen*, 54 F.4th at 335–37 (finding standing where Kentucky's sovereign authority was "at least arguably proscribed" by federal law). The injury to Kentucky's sovereign prerogative over its waters flows directly from the Final Rule's expansion of federal jurisdiction over those same waters. Because that injury would be redressed by returning those waters to Kentucky, the Commonwealth has standing as a sovereign.[10]

And just like the mandates in *Biden* and *Yellen*, the Final Rule directly regulates Kentucky, thus imposing compliance costs. As a district court recently put it, the Final Rule "require[s] States, landowners, and countless other [a]ffected parties to undertake extensive compliance efforts when their property may

---

[9] University of Kentucky, Water Fact Sheet, https://perma.cc/U2CS-Y3FQ.

[10] Unlike the court below, the other two district courts to address this issue have found that the States have standing as sovereigns to challenge the Final Rule. *West Virginia*, 2023 WL 2914389, at *7–8; *Texas*, 2023 WL 2574591, at *5–6.

implicate navigable waters in ill-defined ways." *West Virginia*, 2023 WL 2914389, at *13. To meet its CWA monitoring and reporting obligations, Kentucky will need to "immediately assess which waters . . . will become jurisdictional under the Final Rule." Horne Decl., R.10-1, PageID#407. This process "will require significant time and resources," including "careful legal and technical analysis of the Final Rule as well as field and survey work across the Commonwealth." *Id.* Kentucky will also expend resources "to develop a plan to address the implications of the" Final Rule's expansive jurisdiction "on a number of programs administered by the Commonwealth." *Id.* at PageID#408.

But these are only the start-up costs. More jurisdictional waters under the Final Rule means more monitoring costs for Kentucky. *See, e.g.*, 33 U.S.C. § 1313(c); 40 C.F.R. § 130.7. And it is a "virtual certainty," *Biden*, 23 F.4th at 594, that the Commonwealth will need to process more CWA permits, as more projects will implicate jurisdictional waters under the Final Rule, *see* Horne Dec., R.10-1, PageID#408. These compliance costs establish an injury in fact.[11] *Yellen*, 54 F.4th at 342–43; *see also Biden II*, 57 F.4th at 556. Because these costs are directly

---

[11] The district court faulted the Commonwealth for not estimating dollar amounts for compliance costs. Op. & Order, R.51, PageID#2136–38. Although such amounts can affect the degree of irreparable harm, *Biden II*, 57 F.4th at 556, what matters for standing is that the Commonwealth will have to incur expenses to implement the Final Rule.

traceable to the Final Rule and would be remedied by a favorable ruling here, Kentucky independently has standing in its capacity as regulator.[12]

## B.    The Final Rule exceeds the Agencies' statutory authority.

**1.** The Agencies' "power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). Under the CWA, Congress limited the Agencies' jurisdiction to "navigable waters," meaning "the waters of the United States." 33 U.S.C. § 1362(7). The term "navigable" "show[s] us what Congress had in mind as its authority for enacting the CWA: its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made." *SWANCC*, 531 U.S. at 172.

The Final Rule impermissibly reads the term "navigable" out of the statute. It even admits to doing so. It categorically asserts jurisdiction over all interstate waters "regardless of navigability." 88 Fed. Reg. at 3072. So the Agencies rob the statutory term of any "effect" related to interstate waters. *See SWANCC*, 531 U.S. at 172. It follows that "a mere trickle, an isolated pond, or some other small, non-navigable body of water [is] under federal jurisdiction simply because it crosses a state line or lies along a state border." *Georgia*, 418 F. Supp. 3d at 1359. By

---

[12] Unlike the district court here, the other two district courts to address this issue have found that the States have standing as regulators to challenge the Final Rule. *West Virginia*, 2023 WL 2914389, at * 8; *Texas*, 2023 WL 2574591, at *5–6.

rendering the term "navigable" "devoid of significance" in this respect, the Agencies exceeded their statutory authority. *Rapanos*, 546 U.S. at 731–32, 779; *see Texas*, 2023 WL 2574591, at *6, *9 (so holding); *West Virginia*, 2023 WL 2914389, at *10–11 (same).

The Final Rule robs "navigable" of meaning in less explicit ways, too. For example, in *United States v. Riverside Bayview Homes, Inc.*, the Supreme Court held that "a wetland that *actually abuts* on a navigable waterway" is jurisdictional because adjacent wetlands are "inseparably bound up" with such traditional waters. 474 U.S. 121, 134–35 (1985) (emphasis added). But the Final Rule stretches the term "adjacent" to include "bordering, contiguous, or *neighboring*," 88 Fed. Reg. at 3142, 3143–44 (emphasis added), impermissibly sweeping in wetlands potentially remote from navigable waters, *see Rapanos*, 547 U.S. at 742 (plurality op.); *id.* at 776–77 (Kennedy, J., concurring). And under the Final Rule, even dry, manmade features, like ditches, may be covered tributaries "so long as they contribute to flow" in "a tributary system that *eventually* flows to a traditional navigable water." 88 Fed. Reg. at 3080 (emphasis added). Navigability is thus an afterthought in the Final Rule.

**2.** Worse still, the Agencies can establish jurisdiction over tributaries and wetlands, as well as other intrastate waters, using the Final Rule's expansive

significant-nexus test. That test grants the Agencies jurisdiction over waters that "either alone or in combination with similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity" of traditional waters. *Id.* at 3006. That standard has no basis in the CWA. Instead, the Final Rule purports to draw the standard from Justice Kennedy's concurrence in *Rapanos*. *Id.* at 3037.

As Justice Scalia's plurality opinion in *Rapanos* explained, Justice Kennedy's significant-nexus standard "ignor[es] the text of the statute." *Rapanos*, 547 U.S. at 755–56 (plurality op.). It also misapplies Supreme Court precedent interpreting the CWA. *Id.* at 753–55. And it improperly disregards the Act's policy of preserving the States' primary responsibility for ordinary land-use decisions. *Id.* at 755–56. Again, the doubtful viability of Justice Kennedy's test is pending before the Supreme Court now in *Sackett*, but the Final Rule purports to adopt it anyway.

Even still, the Final Rule's version of the significant-nexus standard departs from Justice Kennedy's standard in meaningful ways, with the practical effect of sweeping in the same sort of isolated, non-navigable waters as in *SWANCC*, 531 U.S. at 170–73. To start, Justice Kennedy proposed including wetlands that "significantly affect the chemical, physical, *and* biological integrity" of navigable waters, *Rapanos*, 547 U.S at 779–80 (emphasis added), but the Final Rule swaps

"and" for the disjunctive "or," 88 Fed. Reg. at 3006. Justice Kennedy also applied his standard only "[w]ith respect to wetlands," which "can perform critical functions related to the integrity of other water." *Rapanos*, 547 U.S. at 779. The Final Rule, by contrast, expands the standard to other types of waters, like tributaries, lakes, ponds, and streams. *See* 88 Fed. Reg. at 3066.

The Final Rule's significant-nexus standard also allows the Agencies to assert jurisdiction over non-navigable, isolated intrastate waters by aggregating those waters' potentially minor influence with that of all "similarly situated" waters "in the region." *See id.* But Justice Kennedy would not have allowed such sweeping aggregation to capture a wetland whose "effects on water quality are speculative or insubstantial." *Rapanos*, 547 U.S. at 780 (Kennedy, J., concurring). And Justice Kennedy admitted that some applications of his test "may not align perfectly with the traditional extent of federal authority." *Id.* at 782.

The Final Rule also departs from Justice Kennedy's opinion by defining an effect as "significant" if it has a "material influence," as determined by assessing five functions and considering five other factors. *See* 88 Fed. Reg. at 3144. Justice Kennedy's standard did not include such malleable considerations. *See Rapanos*, 547 U.S. at 779–80. And regulators can balance these unweighted considerations so that even non-navigable, isolated intrastate waters have sufficient influence to

be jurisdictional, particularly where their influence can be combined with "similarly situated" waters "in the region." *See* 88 Fed. Reg. at 3066. This permits the Agencies to "exercise[] the discretion of an enlightened despot" and diminish the import of the CWA term "navigable." *See Rapanos*, 547 U.S. at 721 (plurality op.). As a result, the Final Rule's "substantial variance from Justice Kennedy's test [should] compel[] the [C]ourt to question its legitimacy." *Texas*, 2023 WL 2574591, at *8.

**3.** The Supreme Court has cautioned that broad claims to jurisdiction under the CWA, like in the Final Rule, raise "significant constitutional questions" about the breadth of Congress's Commerce Clause authority as well as "federalism questions" over the infringement on States' traditional powers. *SWANCC*, 531 U.S. at 173–74. Congress did not provide the requisite "clear statement" that it wanted to shift the "usual constitutional balance of federal and state powers." *Bond v. United States*, 572 U.S. 844, 858 (2014) (cleaned up). To the contrary, Congress clearly stated its intent to "recognize, preserve, and protect the primary responsibilities and rights of States" over land and water use. 33 U.S.C. § 1251(b). The Agencies' extraordinary exercise of authority with significant economic and political consequences also triggers the need for a clear statement under the major-questions doctrine. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022).

**C.     The Final Rule is arbitrary and capricious.**

Agencies must provide reasoned explanations for their actions, lest they be set aside as arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). Here, the Final Rule misapplies its cost-benefit analysis, among other arbitrary-and-capricious features. *See West Virginia*, 2023 WL 2914389, at *13–14 (so holding). For example, the Agencies predict that the Final Rule's impact will be de minimis because it mostly codifies the pre-2015 regime. *See* Economic Analysis Excerpt, R.31-5, PageID#1053. But that ignores several major changes in the Final Rule, including the Agencies' assertion of jurisdiction over a new category of waters and its extension of the significant-nexus test to that category. *See* Economic Analysis Excerpt, R.40-1, PageID#1916. Other differences the Agencies failed to adequately consider and explain include the Final Rule's incorporation of novel "[f]unctions" and "[f]actors" into the significant-nexus test. *See* 88 Fed. Reg. at 3143. The Final Rule does not reflect reasoned judgment.

**D.     The Final Rule raises constitutional concerns.**

By stretching the CWA's Commerce Clause underpinnings to the breaking point, *see SWANCC*, 531 U.S. at 173–74, the Final Rule intrudes on Kentucky's rights under the Tenth Amendment. As discussed, the Agencies' expansion of

jurisdiction over waters that were previously under Kentucky's control infringes its sovereign authority. Indeed, "[t]he categorical extension of federal jurisdiction over all interstate waters, regardless of navigability is of significant constitutional import." *West Virginia*, 2023 WL 2914389, at *15. Plus, "[t]he 2023 Rule's 'significant-nexus' standard poses important due process concerns which may not be clarified until the United States Supreme Court issues a decision in *Sackett* this term." *Id.*

## II.    The Final Rule is causing irreparable harm.

Kentucky is suffering at least two irreparable injuries because of the Final Rule: infringement on its sovereignty and unrecoverable compliance costs. *Biden* and *Yellen* make this part of the analysis easy, too.

In *Biden*, this Court recognized Kentucky's prerogative to protect its sovereign interests when it "believes the federal government has intruded upon areas traditionally within [Kentucky's] control." 23 F.4th at 598. Such invasions of state sovereignty "likely cannot be economically quantified, and thus cannot be monetarily addressed." *Biden*, 23 F.4th at 612 n.19. So a "[l]oss of sovereignty is an irreparable harm." *Georgia*, 326 F. Supp. 3d at 1367.

*Biden* and *Biden II* also make clear that incurring unrecoverable compliance costs counts as irreparable harm. *Biden*, 23 F.4th at 611–12; *Biden II*, 57 F.4th at

21

556. Just as the mandate in those cases required the States to expend money to "ensur[e] compliance," *Biden II*, 57 F.4th at 556, the Final Rule compels Kentucky to spend money to comply with its monitoring, reporting, and permitting obligations under the CWA, Horne Decl., R.10-1, PageID#407–08. Those costs are a quintessential irreparable harm, *Biden II*, 57 F.4th at 556, particularly because a decision in *Sackett* may well force the Agencies back to the drawing board any day now. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part and concurring in the judgment) ("[C]omplying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs.").

## III. The equities and the public interest favor an injunction pending appeal.

The balance of equities and the public interest, which merge here, *Nken v. Holder*, 556 U.S. 418, 435 (2019), fully support enjoining the Final Rule pending appeal.

To begin, "'the public interest lies in the correct application' of the law." *Biden II*, 57 F.4th at 556 (citation omitted). As discussed above, the Final Rule goes beyond the CWA's text, is arbitrary and capricious, and raises constitutional concerns. And it does so when we are on the cusp of getting guidance from the Supreme Court in *Sackett*. *See West Virginia*, 2023 WL 2914389, at *26 (finding it

in the public interest to wait for *Sackett*'s rendition). The harm in simply pausing the Final Rule to wait for *Sackett* is minimal. In addition, although the Agencies are wrong to argue that the Final Rule essentially codifies the prior regime, their downplaying of the effects of the Final Rule suggests they do not believe an injunction pending appeal will meaningfully harm them. Indeed, the Agencies are now enjoined from enforcing the Final Rule in more than half the States. *Id.* at *26; *Texas*, 2023 WL 2574591, at *13. Meanwhile, the Commonwealth's sovereign and financial injuries weigh strongly in favor of injunctive relief. *See Biden*, 23 F.4th at 612.

## CONCLUSION

This Court should enjoin the Final Rule pending appeal.

Respectfully submitted by,

*s/ Matthew F. Kuhn*
Daniel Cameron
 *Attorney General*
Victor B. Maddox
 *Deputy Attorney General*
Matthew F. Kuhn
 *Solicitor General*
Harrison Gray Kilgore
Jenna M. Lorence
 *Assistant Solicitors General*

*Counsel for Plaintiff-Appellant*

Office of Kentucky Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
Matt.Kuhn@ky.gov

23

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limitation in Fed. R. App. P. 27(d)(2)(A) because it contains 5,011 words. This motion also complies with the typeface requirements of Fed. R. App. P. 27(d)(1)(E) and 32(a)(5) and the type-style requirements of Fed. R. App. P. 27(d)(1)(E) and 32(a)(6) because it has been prepared in 15-point Garamond font using Microsoft Word.

*s/ Matthew F. Kuhn*

## CERTIFICATE OF SERVICE

I certify that on April 19, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system. I also certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*s/ Matthew F. Kuhn*

# ADDENDUM

Exhibit 1          Affidavit of John Horne, R.10-1, PageID#404–08

Exhibit 2          Opinion & Order, R.51, PageID#2120–41

# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT FRANKFORT
*Electronically filed*

**COMMONWEALTH OF KENTUCKY**

*Plaintiff,*

v.

**UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,** *et al.*

*Defendants.*

Civil Action No.___3:23-cv-00007-GFVT___

## DECLARATION OF JOHN G. HORNE, II

I, John G. Horne, II hereby declare as follows:

1. I am the Executive Director of the Office of Rate Intervention within the Office of the Kentucky Attorney General. I have served in that role since December 17, 2019. The Office of Rate Intervention is responsible for representing the interests of Kentucky consumers before governmental rate-making agencies, including in utility cases (electric, water, telecommunications, and natural gas) before the Public Service Commission.

2. Before serving as Executive Director of the Office of Rate Intervention I served as General Counsel for the Kentucky Energy and Environment Cabinet ("Cabinet"). I was General Counsel for the Cabinet from January 2016 to December 2019. The Cabinet is charged with supervising the administration and enforcement of Kentucky's environmental statutes and regulations. *See* Ky. Rev. Stat. 224.10-100, *et seq.*

3.  As General Counsel, I assisted the Division of Water in ensuring that the Cabinet lawfully implemented the Clean Water Act in Kentucky, including developing Kentucky's Water Quality Standards (WQS), monitoring and assessing Kentucky's water resources, developing Total Maximum Daily Loads (TMDL), and incorporating federal requirements so that the Commonwealth's Kentucky Pollutant Discharge Elimination System permitting program complied with the Act. I also assisted the Division of Water with ensuring Kentucky's compliance with the Water Quality Certification (WQC) program pursuant to 33 U.S.C. § 1341(a).

4.  The Attorney General is authorized to assist the Cabinet in bringing civil and criminal actions to enforce Kentucky's environmental laws and regulations, including those protecting the Commonwealth's waters. *See, e.g.*, Ky. Rev. Stat. § 224.99-020.

5.  Based on my current position in the Attorney General's office and my past experience as General Counsel for the Cabinet, I have personal knowledge and experience to understand the steps the Commonwealth will need to undertake because of the *Revised Definition of "Waters of the United States*," 88 Fed. Reg. 3004 (Jan. 18, 2023) ("Final Rule"), recently promulgated by the U.S. Environmental Protection Agency and the U.S. Army Corps of Engineers (collectively, the "Agencies").

6.  The Final Rule significantly expands the jurisdictional waters under the Clean Water Act, impeding the Commonwealth's sovereignty over, and primary

responsibility for, regulating lands and waters. All waters in Kentucky are recognized as Waters of the Commonwealth and all surface waters receive protection of their water quality by Kentucky WQS in 401 KAR Chapter 10. But under the Final Rule, Kentucky will now have secondary authority over lands and waters it previously regulated exclusively.

7. The Agencies' expanded definition of jurisdictional waters will also cost Kentucky financially. To ensure compliance with the Clean Water Act, the Cabinet must immediately assess which waters (and lands) not currently considered "waters of the United States" will become jurisdictional waters under the Final Rule. Because Kentucky has a diverse topography, ecology, and climate, the Final Rule will sweep up a wide array of waters and lands not currently considered jurisdictional, and it will require significant time and resources to identify these new jurisdictional waters. Separating jurisdictional waters from non-jurisdictional waters will require careful legal and technical analysis of the Final Rule as well as field and survey work across the Commonwealth.

8. This task is made more difficult—and costly—because the Final Rule's significant nexus test leaves substantial room for arbitrary enforcement by the Agencies. When any nook or cranny that occasionally becomes moist might qualify as "water of the United States," it will take time and manpower for Kentucky to determine fully and accurately the many additional miles of jurisdictional streams and acres of jurisdictional wetland under the Final Rule.

3

9. But those are only some of the start-up costs. The Cabinet will need to develop a plan to address the implications of the Final Rule on a number of programs administered by the Commonwealth, including (1) the WQS program conducted under 33 U.S.C. § 1313(c); (2) Monitoring and Assessment of waters undertaken pursuant to 33 U.S.C. § 1315(b); (3) the TMDL program pursuant to 33 U.S.C. § 1313(d); and (4) the WQC program pursuant to 33 U.S.C. § 1341(a).

10. Then there will be implementation costs. More jurisdictional waters necessarily mean the Cabinet will have more water quality and environmental assessments to conduct and more permit applications to process under Section 1342. Thus, the Commonwealth will likely need to hire additional manpower or divert already-limited time and resources away from other important agency functions to maintain its current level of regulatory oversight.

11. In sum, Kentucky will need to expend resources to analyze and implement the Final Rule—which infringes the Commonwealth's sovereignty—and absent relief from this Court, the Commonwealth will need to expend additional resources going forward because of the Final Rule to make sure it complies with its obligations under the Clean Water Act.

I declare under penalty of perjury that the foregoing is correct. Executed on this 22nd day of February, 2023 at Frankfort, Kentucky

John G. Horne, II

4

# EXHIBIT 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

COMMONWEALTH OF KENTUCKY,  )
*et al.*,                                              )
                                                          )          Civil No. 3:23-cv-00007-GFVT
          Plaintiffs,                             )
                                                          )
v.                                                      )                    **OPINION**
                                                          )                          **&**
ENVIRONMENTAL PROTECTION  )                    **ORDER**
AGENCY, *et al.*,                             )
                                                          )
          Defendants.                           )

**\*\*\*    \*\*\*    \*\*\*    \*\*\***

          The Environmental Protection Agency and Army Corps of Engineers have promulgated a

rule redefining "waters of the United States."  This term defines the scope of the Clean Water

Act.  The Rule has not yet been enforced.  Nevertheless, the Commonwealth of Kentucky and

various business groups want to challenge it.  And they want the Court to put the Rule on hold

while they litigate the matter.  [R. 10; R. 17.]  Their allegations may very well present a federal

cause of action.  But not yet.

          Without a certainly impending injury, the matter is not ripe for review.  Simply put, there

is no standing.  Judges may not pull a case off the shelf because the policy issue is compelling.

Their work is limited to "cases and controversies," words of limitation.  The Court has no power

to decide this matter and so, for the reasons set out below, the Motions for Preliminary Injunction

[R. 10; R. 17] are **DENIED WITHOUT PREJUDICE**.

**I**

          Congress passed the Clean Water Act in 1972 to "restore and maintain the chemical,

physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  It governs

"navigable waters," which it defines as "the waters of the United States." 33 U.S.C. § 1362(7).

The Act contemplates a joint state and federal enforcement scheme. States establish water

quality standards and administer the National Pollutant Discharge Elimination System for

"waters of the United States" found in their borders. *Id.* at §§ 1313, 1342. The states govern

all other waters on their own, consistent with traditional notions of land and water governance.

*See Tarrant Reg'l Water Dist. v. Herrmann*, 569 U.S. 614, 631-32 (2013); *Ky. Waterways All.*

*v. Ky. Utils. Co.*, 905 F.3d 925, 928 (6th Cir. 2018). The Act specifically states that its intent is

not to impede states' responsibilities and rights in governing pollution and land use. 33 U.S.C.

§ 1251(b).

Defining "waters of the United States" has been a near fifty-year project which, as this

litigation demonstrates, remains ongoing. The first major change was in 1986, when the

agencies promulgated the 1986 Regulations. 33 C.F.R. § 328.3 (1986). These regulations

established seven categories of waters covered by the CWA: (1) traditional navigable waters;

(2) interstate waters; (3) "other waters," i.e., intrastate waters which could affect interstate or

foreign commerce; (4) impoundments; (5) tributaries; (6) the territorial seas; and (7) adjacent

wetlands. *Id.* These regulations were in effect until 2015. [R. 31 at 22.]

Three Supreme Court cases notably interpret "waters of the United States." The Court

decided *United States v. Riverside Bayview Homes, Inc.* the year before the 1986 Regulations.

474 U.S. 121, 134-35 (1985). It found that wetlands adjacent to a navigable waterway are

"waters of the United States" and may be governed under the CWA. *Id.* at 139. This ruling

confirmed that "waters of the United States" is broader than "traditionally navigable" waters.

*Id.* at 133. The Court observed that the CWA uses a "broad systemic view of the goal of

maintaining and improving water quality." *Id.*

2

The Court weighed in on the 1986 Regulations in *Solid Waste Agency of Northern Cook County v. USACE*. 531 U.S. 159 (2001). The Army Corps asserted CWA jurisdiction over isolated ponds because they were used by migratory birds. *Id.* at 171-72. The Court found that this stretched "waters of the United States" too far. *Id.* It noted that the CWA's jurisdictional scope is limited by the term "navigable," the Commerce Clause, and respect for traditional state domain over internal waters. *Id.* at 172-74. It also stated that *Riverside Bayview* rests on the "significant nexus" between wetlands and adjacent waters. *Id. at* 167.

This "significant nexus" observation informed the Supreme Court's next CWA case: *Rapanos v. United States*, 547 U.S. 715 (2006). In a fractured opinion, the Court rejected the Army Corps's determination that certain Michigan wetlands were "waters of the United States." *Id.* at 742. Justice Scalia's plurality opinion created the "relatively permanent" test. *Id*. at 719-57. He limited "waters of the United States" to "relatively permanent, standing or flowing bodies of water" and secondary waters with a "continuous surface connection" to such waters. *Id.* at 733, 742. Justice Kennedy's concurrence created the broader "significant nexus" test. *Id.* at 759-87. This test limits "waters of the United States" to those "navigable in fact or that could reasonably so be made" and secondary waters with a "significant nexus" to such waters. *Id.* at 759.

The Agencies issued the "*Rapanos* Guidance" to explain how the 1986 Regulations operated in light of these cases. [R. 31-2.] The Defendants state that "[g]enerally, the Guidance explained that non-navigable waters are jurisdictional if they met either the relatively permanent or significant nexus standard." [R. 31 at 22.] This scheme was in place until 2015.

2015 kicked off a years-long process to re-define "waters of the United States." That year, the Agencies promulgated a Rule defining three categories of "waters of the United

3

States."  [R. 1-1 at 12.]  Due to legal challenges, it was in minimal effect.  [R. 31 at 22.]  In 2017, Executive Order 13778 directed the Agencies to review the 2015 Rule with certain policy objectives.  [R. 1-1 at 13.]  This led to the 2019 Rule, which "repeal[ed] the 2015 Clean Water Rule and recodif[ied] the 1986 regulations without any changes to the regulatory text."  *Id.*

On January 23, 2020, the Agencies promulgated the "Navigable Waters Protection Rule: Definition of 'Waters of the United States,'" defining "waters of the United States" based on Justice Scalia's plurality opinion in *Rapanos.  Id.*  Two courts vacated the Rule and the Agencies returned to the pre-2015 regime, which is the current status quo.  [R. 31 at 23.]

On January 20, 2021, President Biden signed Executive Order 13990, which revoked the Executive Order that had initiated the 2020 NWPR.  [R. 1-1 at 15.]  Accordingly, the Agencies reviewed the 2020 NWPR and decided to revise the rule.  *Id.* at 16.  The Final Rule, "Revised Definition of 'Waters of the United States,'" "specifies five categories of 'waters of the United States,' eight exclusions, and six defined terms."  [R. 23 at 7.]

The Commonwealth brought this action alleging that the Rule violates the Clean Water Act, Administrative Procedure Act, and U.S. Constitution.  [R. 1.]  On the same day, the private-sector plaintiffs filed a separate suit with the same allegations.  *Ky. Chamber of Comm. v. EPA*, 3:23-cv-00008 at [R. 1].  On the parties' agreement, the Court consolidated the cases.  [R. 16.] The Commonwealth and the private-sector plaintiffs both also filed Motions for a Preliminary Injunction asking the Court to preliminarily enjoin the agencies from enforcing the Rule.  [R. 10; R. 18.]  The Rule went into effect on March 20, 2023, while the Motions were under advisement. [*See* R. 1-1 at 2.]

## II

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington–Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)) (cleaned up) ("[A] preliminary injunction involv[es] the exercise of a very far-reaching power . . .")). To issue a preliminary injunction, the Court must consider whether: (1) the movant shows a strong likelihood of success on the merits; (2) the movant will suffer irreparable harm if the injunction is not issued; (3) the issuance of the injunction would cause substantial harm to others; and (4) the public interest would be served by issuing the injunction. *Overstreet*, 305 F.3d at 573 (citations omitted).

The Defendants argue that the Plaintiffs are unlikely to succeed on the merits because they do not have standing to pursue this action. [R. 31 at 11-21.] Standing requires (1) an injury-in-fact that is (2) traceable and (3) redressable. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The Defendants focus on the Plaintiffs' claimed injuries, arguing that they are "conjectural and hypothetical," not "actual and imminent." *Id.* at 339; [R. 31 at 18-21]. Relatedly, the Defendants argue that the Plaintiffs do not establish an irreparable injury sufficient to justify a preliminary injunction. *Id.* at 11-18.

The Plaintiffs seek injunctive relief before the agencies have begun enforcing the Rule. This implicates decades of precedent considering when an expected injury affords standing. Pre-enforcement review is permissible if threatened enforcement is "sufficiently imminent." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). "[A]n actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Id.* at 158. A movant must establish "an intention to engage in a course of conduct arguably affected with a constitutional

interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution thereunder." *Id.* at 159 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).

Determining whether a pre-enforcement challenge is sufficiently imminent to confer standing implicates the closely related doctrine of ripeness. Ripeness asks whether the alleged injury-in-fact is "certainly impending." *Nat'l Rifle Assoc. of Am. v. Magaw*, 132 F.3d 272, 280 (6th Cir. 1997). To establish ripeness, the plaintiff must show "actual present harm or a significant possibility of future harm." *Id.* at 279.

Ultimately, "standing and ripeness issues 'boil down to the same question:'" whether the threatened injury is "certainly impending." *Driehaus*, 573 U.S. at 157 n.5, 158. This inquiry upholds the very foundation of the federal judiciary: Article III of the United States Constitution. Federal courts only have the power to hear "cases and controversies." U.S. Const. art. III § 2; *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Standing is the "irreducible constitutional minimum" required for a Court to consider a dispute. *Lujan*, 504 U.S. at 560. Absent the kind of injury sufficient to confer standing, a party does not have an adequate stake in the outcome of the litigation to make it a "case or controversy." *See Baker v. Carr*, 369 U.S. 186, 204 (1962).

The injury requirement cabins the federal courts' power. *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1177 (D.C. Cir. 1982) (Bork, J., concurring) ("[I]njury in fact, far from being a simple, descriptive term, is a concept freighted with policies that limit the kinds of injury courts may consider."). Both its constitutional and prudential elements are "founded in concern about the proper—and properly limited—role of the court in a democratic society." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). Hewing close to "cases of a form historically viewed as capable of judicial resolution" affirms the democratic value of separation of powers by avoiding

the expansion of judicial power. *Id.* (quoting *Flast v. Cohen*, 392 U.S. 83, 101 (1968)). After all, deciding a matter in which the plaintiff has no standing would result in the court "decid[ing] abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions." *Warth*, 422 U.S. at 500. Though courts may be tempted to relax standing requirements to reach the merits of a particular issue, avoiding that temptation is an important exercise of judicial restraint which maintains the separation of powers.

Plaintiffs bear the burden of establishing standing. *Lujan*, 504 U.S. at 561. And because the elements of standing are "not mere pleading requirements but rather an indispensable part of the plaintiff's case," the plaintiff must support each element with "the manner and degree of evidence required at the successive stages of the litigation." *Id.* Movants must substantiate their claimed injury with evidence establishing that injury. *Mich. Coal. of Radioactive Materials, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991). Accordingly, the issue is whether the Plaintiffs provide evidence that the Rule threatens a certainly impending injury.

## A

The private-sector plaintiffs fail to make this showing. As organizations, they must establish either organizational or associational standing. *See Shelby Advocates for Valid Elections v. Hargett*, 947 F.3d 977, 981 (6th Cir. 2020). The private-sector plaintiffs claim that they have associational standing. [R. 37-1 at 4.] Associational standing allows an entity to sue over injury suffered by its members if: (1) its members would have standing on their own, (2) its interest in the suit is germane to its purpose, and (3) neither the claim nor the requested relief

7

requires the participation of individual members.[1]  *Ass'n of Am. Phys. & Surgeons v. FDA*, 13 F.4th 531, 538 (6th Cir. 2021).

The Defendants do not argue that the private-sector plaintiffs' interests are not germane to their purposes or that their individual members need to participate.  [R. 31 at 27-37.]  Rather, they allege that the private-sector plaintiffs have not established that any of their members would have standing to pursue this case on their own.  *Id.* at 34-36.  Specifically, they argue that the members' claimed injuries are too "speculative, hypothetical, or otherwise lacking" to establish standing.  *Id.* at 34.  The private-sector plaintiffs claim that their members face injury-in-fact because they are "indisputably regulated" by the Rule and provide declarations explaining their injuries.  [R. 37-1 at 4.]

The declarations come in two forms: statements on behalf of the organizations, none of which identify a specific affected member, and statements by the organizations' members.  [R. 17-1.]  The former do not establish associational standing because it is insufficient to claim "that the defendant's conduct will harm an unknown member."  *AAPS*, 13 F.4th at 531.  The organization "must instead identify a member who has suffered (or is about to suffer) a concrete and particularized injury from the defendant's conduct."  *Id.*

Two of the private-sector plaintiffs failed to identify an individual member.  The Portland Cement Association states that its members may need to hire consultants, apply for permitting which was not required before the Rule, and relocate or change current projects.  [R. 17-1 at 7.]  The Home Builders' Association of Kentucky claims that its members will need to obtain more

---

[1] The Sixth Circuit cast serious doubt on this test in *AAPS*.  13 F.4th at 538-42.  It observed that the associational standing test is "not obviously reconcilable" with the Supreme Court's guidance on which standing elements are "prudential" and which are constitutional.  *Id.*  Nevertheless, it followed guidance to "stick to . . . directly on-point precedent even if the logic from other cases has called that precedent into doubt."  *Id.* at 542.  The Circuit still applied this test because it is "directly on-point precedent" from the Supreme Court.  *Id.*  So too will this Court.

permits because more waters fall under the CWA's jurisdiction.  *Id.* at 42.  Neither declaration identifies a specific affected member, nor did any such member submit their own declaration. The PCA and HBAK do not have associational standing.  *AAPS*, 13 F.4th at 531

At least one member of each of the remaining private-sector plaintiffs submitted a declaration.  Alliance Coal, a member of the Kentucky Chamber of Commerce, claims it is currently working on three projects that the Rule will impact.  [R. 17-1 at 18.]  It states it will now "have to spend time and money to determine the extent of federal jurisdiction" over those projects.  *Id.* at 20.  Alliance also identifies a specific land purchase and states that, because of the Rule, related fees "are anticipated to rise by greater than 75%."  *Id.* at 20.  Logan Aluminum, a member of the Kentucky and U.S. Chambers of Commerce, is "concerned that further expansion of the jurisdictional scope . . . would add unnecessary costs and delays to future expansion plans and uncertainty to its planning process" and states that it owns properties with waters whose status "will be unclear to Logan should the new Rule become effective."  *Id.* at 25. O'Bryan Grain Farms, also a member of the Kentucky and U.S. Chambers of Commerce, asserts it "will have to hire consultants and attorneys to determine whether [the Rule will affect] current and future farming activities."  *Id.* at 31.  Innovative Demolition, a member of the Associated General Contractors of Kentucky, fears that "[t]he Rule could affect" bridge demolition projects for which it has contracts and that the resulting uncertainty "could cause delays."  *Id.* at 45. SEDA, a member of the Georgia Chamber of Commerce believes that some properties it "purchased and planned for development may no longer be viable development projects" and that it "will have to invest significant time and money to determine whether and to what extent water features and wetlands on its property will be subject to federal jurisdiction."  *Id.* at 48.

These alleged injuries can be broken into two categories: (1) costs resulting from more waters being subject to the CWA than in the pre-2015 regime and (2) costs of conducting new surveys to determine whether waters are now subject to the CWA.

**1**

The first category of allegations is too speculative to confer standing. Members claim that they are "likely to be impacted," fees "are anticipated to rise," the status of water features will be "unclear," the Rule will "likely trigger additional analysis that may sweep in water features," and the Rule "may jeopardize" the feasibility of property development. *Id.* at 18, 20, 24, 45, 50. These claims are mere speculation, not evidence that the Rule's impact will "be felt immediately." *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 164 (1967).

*Abbott Labs* and its companion case *Toilet Goods* demonstrate the degree of certainty necessary to challenge a regulation before it goes into effect. The Plaintiffs in *Abbott Labs* had pre-enforcement standing because the challenged regulation was "directed at them in particular," required them to make "significant changes in their everyday business practices," and "clearly exposed [them] to the imposition of strong sanctions" if they failed to comply. *Abbot Labs. v. Gardner*, 387 U.S. 136, 153 (1967). In contrast, the plaintiffs in *Toilet Goods* did not have standing because the court had "no idea whether or when" factory inspections would occur under a new rule. *Toilet Goods*, 387 U.S. at 163. Ultimately, a claim is ripe and pre-enforcement standing exists when the statute "can realistically be expected to be enforced against a plaintiff singled out for regulation" and the plaintiff can show "the statute's direct and immediate impact on his business" and that compliance "will cause significant economic harm." *Magaw*, 132 F.3d at 290.

10

The private-sector plaintiffs are far more similar to those in *Toilet Goods* than *Abbott Labs.* The Court has "no idea whether or when" the Rule will change how the CWA applies to any particular member because they do not identify any specific water feature or related project and explain how the Rule will affect it. *Toilet Goods*, 387 U.S. at 163. Rather, they raise general fears that the Rule covers more waters and that increased costs may result. Unlike in *Abbot Labs*, they identify no "immediate and significant change in the . . . conduct of their affairs" and the Rule is not "directed at them *in particular*." 387 U.S. at 153-54 (emphasis added). As Innovation Demolition itself states, "it is unclear whether the parameters affected by permitting for [projects it is creating bids for] will change." *Id.* at 46. These speculative claims are "allegations of possible future injury," not "certainly impending injuries." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

Alliance Coal comes closest to, but still falls short of, identifying a certainly impending injury. It identifies three permit projects on which it is "presently" working with the Army Corps. [R. 17-1 at 19.] Each project involves ephemeral streams or isolated wetlands. *Id.* It states that all "are likely to be impacted by the Rule." *Id.* at 18. Perhaps Alliance could establish standing if it explained why or how the Rule change impacts these projects. But a "likely" impact is merely an "allegation of possible future injury" absent an explanation of why the entity believes the impact will occur. *Clapper*, 568 U.S. at 409.

Alliance also claims that it has had to "withdraw and resubmit permit applications," causing delays, due to the "changing and inconsistent definitions provided by the Rule." [R. 17-1 at 19.] But this allegation refers to the varied efforts to define "waters of the United States" over the past few years, not the new Rule specifically. Alliance refers to a "changing and

inconsistent definition." *Id.* The definition of "waters of the United States" changed numerous times in the years preceding the Rule, but the Rule itself provides one definition. Further, Alliance claims the "changing and inconsistent definition" has already caused it harm. *Id.* Perhaps previous regulatory changes influenced its projects and required it to resubmit permit applications. But the Rule itself could not have done so before it went into effect. Accordingly, it does not appear that the Rule, which is the subject of this action, caused Alliance's permit withdrawals and resubmissions.

The private-sector plaintiffs claim that their members' standing is "self-evident" because they are regulated entities. [R. 40 at 3.] The cases they rely on find that standing is "self-evident" when the petitioner is an "object of the action." For example, the plaintiff in *Bonacci* challenged TSA policies intended to expedite pilot and flight attendant screenings. *Bonacci v. Trans. Sec. Admin.*, 909 F.3d 1155, 1159 (D.C. Cir. 2018). He was an "object" of those policies because it was "undisputed" that TSA agents had *already* subjected him to the policy. *Id.* None of the private-sector plaintiffs allege that any agency has already applied the Rule to them.

The private-sector plaintiffs also invoke *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 55 (6th Cir. 2015). In *Lew*, the plaintiff challenged the constitutionality of the Consumer Financial Protection Bureau. *Id.* It could bring that challenge before the Bureau initiated an enforcement action against it because there was "no doubt" that the Bureau regulated it, as it was subject to ongoing regulations which the Bureau promulgated. *Id.* at 53. This case is distinguishable because the plaintiffs are not challenging the constitutionality of the agencies which actively regulate them.

Ultimately, the private-sector plaintiffs' members are not "objects" of the Rule simply because they own land with water features which may or may not be subject to it. They may

become objects of the Rule if the agencies determine that waters on their land are now "waters of the United States" and are subject to regulation. Absent such a determination or a specific showing that, if the agencies were to review specific waters, they would come to this conclusion, the members are not yet "objects of" the Rule. Because potentially greater costs are not a "certainly impending" injury and the members are not yet "objects" of the Rule, the members' claims are not ripe.

**2**

Second, the members raise the related but distinct allegation that they will have to expend resources to determine whether the Rule makes waters on their properties newly jurisdictional. [R. 17-1 at 20, 25-26, 31, 45, 50.] At the preliminary injunction hearing, the private-sector plaintiffs indicated that their best case on standing is *Commonwealth v. Biden*, which addresses compliance costs. [R. 45 at 28-30.] There, the Commonwealth faced an irreparable injury because it was "likely to incur unrecoverable compliance costs" once allegedly unlawful vaccine mandates went into effect. *Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023). The Court recognized that other circuits "have held that compliance costs do not qualify as irreparable harm because they commonly result from new government regulation." *Id*. But it found that compliance costs *may* constitute injury depending on "the peculiarity and size of a harm." *Id.*

Some of the compliance costs that the members allege they will incur are costs of permitting and jurisdictional assessments for future projects. These costs are not "peculiar" because the members all state that obtaining such reviews is a normal part of their business. *Id.* For example, Alliance states that throughout the permitting process for one of its properties, it has "expend[ed] considerable time and resources in the engagement of private consultants" and

13

has "had to withdraw and resubmit permit applications" due to the "changing and inconsistent definitions provided by the Rule. [R. 17-1 at 19.] O'Bryan also states that it was "required to hire attorneys to defend and advise [it] concerning" the jurisdictional bounds of the CWA *before* the issuance of the Rule. *Id.* at 31. Finally, Logan Aluminum "has already spent significant staff time trying to understand the various new standards and terms introduced by the rule." *Id.* at 26.

"In *Abbott Labs*, the hardship requirement was satisfied by the fact that the affected companies either had to expend substantial amounts of money to comply with the regulations or not comply and risk serious criminal and civil penalties." *Magaw*, 132 F.3d at 286. The members of the private-sector plaintiffs are not in a comparable position because, as they state themselves, jurisdictional assessments and consultations are a common element of doing business in a way which implicates the CWA. Before the Rule, these businesses had to assess their land to determine whether it contains jurisdictional waters, apply for permits, and expend resources analyzing whether the CWA applies. They anticipate needing to do so under the new Rule as well. These costs are not "peculiar" because they exist before and after the Rule goes into effect. *Biden*, 57 F.4th at 556. Accordingly, the Rule is not *causing* the alleged compliance cost injury.

The members also allege that, on the day the Rule goes into effect, they must hire consultants to determine whether waters are now subject to the CWA which were not previously. These are not the sort of compliance costs which the cases contemplate as establishing standing. The cost of assessing whether one needs to comply with a regulation is different than the costs imposed by actually complying. For example, in *Commonwealth v. Biden*, the challenged mandate required employers to "designate individuals to distribute information about the vaccination mandate and to collect documentation for the purpose of ensuring compliance." 57

14

F.4th at 556.  There was no question whether the mandate applied to the employer-plaintiffs and required them to immediately alter their business to comply or risk penalties.  *Id.*  The compliance costs arose out of actually complying with the mandate, not determining whether they needed to comply with the mandate.

The private-sector plaintiffs' members are not similarly situated because the costs they will allegedly immediately incur do not arise from complying with the Rule.  Rather, they may incur costs in answering the preliminary question of whether they need to change anything about their business practices to comply with the Rule.  They provide no specifics on the extent of these costs.  They cite, and the Court is aware of, no authority for the notion that an unspecified amount of costs incurred in determining whether compliance is necessary constitutes a certainly impending injury.

The standing analysis would be different if the members knew, or had a compelling legal argument, that the Rule makes specific waters on their lands newly jurisdictional and could demonstrate that substantial or peculiar compliance costs would result.  *Biden*, 57 F.4th at 556.  But as it stands, the members allege that they will incur costs that are either ongoing costs or are preliminary to the Rule's actual or suspected application.  The private-sector plaintiffs fail to identify a certainly impending injury, so their claims are not ripe, they have no standing, they are unlikely to succeed on the merits, and they are not entitled to a preliminary injunction.

**B**

The Defendants also argue that the Commonwealth faces no injury-in-fact sufficient to establish standing.  [R. 31 at 36-37.]  The Commonwealth believes that the Rule threatens immediate injuries to its sovereignty and to its finances as both regulator and landowner.  [R. 10 at 10-13.]

1

First, the Commonwealth believes that, by expanding CWA jurisdiction, the Rule infringes upon its sovereignty. *Id.* at 10-11. Specifically, by allegedly unlawfully expanding CWA jurisdiction to encompass more waters, the Rule "usurp[s]" the Commonwealth's "traditional and primary power over land and water use." [R. 39 at 2 (quoting *SWANCC*, 531 U.S. at 174).] The Commonwealth cites *Texas v. EPA* and *Kansas v. United States* to support its claim that this infringement "is an injury-in-fact." *Id.* Neither is availing.

In *Texas v. EPA*, Texas challenged an agency action replacing states' plans for regulating emissions. 829 F.3d 405, 414-17. Texas demonstrated irreparable injury by pointing to specific actions that regulated companies would have to undertake to comply, specific plants which would shut down, and specific rates which would increase. *Id.* at 433. The court observed that "the institutional injury to Texas from the inversion of the federalism principles enshrined in the Clean Air Act *may* constitute irreparable injury." *Id.* at 434 (emphasis added). The Commonwealth makes no similarly specific showing on the Rule's impact. And one line in an out-of-circuit case stating that threats to sovereignty "may" constitute injury is insufficient to establish standing.

In *Kansas v. United States*, the Tenth Circuit affirmed a district court's preliminary injunction of the National Indian Gaming Commission's determination that a tract of land was "Indian land." 249 F.3d 1213, 1218 (10th Cir. 2001). Kansas established irreparable injury by claiming that "the NIGC's decision places its sovereign interests and public policies at stake." *Id.* at 1227. Kansas was not pursuing pre-enforcement review and there were no questions as to whether the injury to its sovereignty was certainly impending. The NIGC had made a clear determination that land which Kansas alleged was its own was in fact "Indian land." *Id.* at

1218.  Injury was certainly impending because the tribal landowners intended to proceed with constructing a gaming facility absent an injunction.  *Id.* at 1228.

The Commonwealth's allegation that CWA jurisdiction may expand and may infringe on waters over which it is sovereign is not comparable.  Perhaps the Commonwealth could establish an infringement on its sovereignty by identifying a water which should be in its exclusive control over which the agencies assert jurisdiction under the new Rule.  Absent such a showing, injury to its sovereignty is not certainly impending.  *Clapper*, 568 U.S. at 409.

### 2

The Commonwealth also argues that it faces economic injury because it will incur compliance costs in incorporating the Rule into its water quality standards and permitting process.  [R. 10 at 11.]  It claims that the Rule requires the Commonwealth to expend more resources to identify new jurisdictional waters, determine whether they meet the water quality standards, and act if they do not.  *Id.* at 11-12.  As explained above, compliance costs resulting from new government regulation can constitute irreparable injury, depending on their size and peculiarity.  *Biden*, 57 F.4th at 556.

The Commonwealth does not establish the amount (or "size") of compliance costs which it will allegedly incur.  It submitted a declaration stating that it will have to "immediately assess which waters (and lands)" are now jurisdictional, requiring "careful legal and technical analysis" and "field and survey work."  [R. 10-1 at 4.]  It will also have to "develop a plan to address the implications of the Final Rule on a number of programs administered by the Commonwealth" and "will likely need to hire additional manpower or divert" resources.  *Id.* at 5.

A "likely" need to increase hiring or divert resources is speculative, not certain, because the allegation is unsupported by any specifics.  Compare these assertions to those of Mississippi

17

in *Crane v. Johnson.* 783 F.3d 244, 252 (5th Cir. 2015). There, Mississippi submitted a study showing that illegal immigration costs it more than $25 million per year. *Id.* That report was insufficient to give the state standing to challenge DACA because it contained "no concrete evidence that Mississippi's costs had increased or will increase *as a result of DACA.*" *Id.* (emphasis added). To show a "concrete and particularized" injury, Mississippi would have had to show facts establishing that costs would result from the rule change itself. *Id.* Stated otherwise, a rule change must cause peculiar compliance costs which the state would not otherwise incur. *Id.*; *Biden*, 57 F.4th at 556. The Commonwealth does not establish this. It only alleges that it will "likely," but not "certainly," have to expend resources to comply with the Rule which it would not have had to expend previously. And the degree of those costs is not only unproven, but unalleged.

Similar challenges to the one at hand are currently pending in the Southern District of Texas and District of North Dakota. [*See* R. 31 at 25-26.] While the instant Motions were under advisement, the Southern District of Texas issued an Order granting Texas and Idaho's Motion for Preliminary Injunction challenging the Rule. [R. 46-1.] It found that the states established standing because Texas "submitted detailed declarations outlining projected mitigation and compliance costs." *Id.* at 14. It specifically alleged that mitigation costs would collectively increase by $3,000,000 and, for a specific project, from $292,600 to $80,591,000. *Id.* Kentucky makes no similar showing. [R. 10-1.]

The Texas court also concluded that Idaho also had standing although its "declarations [were] less detailed." [R. 46-1 at 15.] It relied on the Fifth Circuit's ruling in *Texas v. Biden*, which stated that "large-scale policy" is "amenable to challenge using large-scale statistics and figures." 20 F.4th 928, 971 (5th Cir. 2021). Even if this were controlling precedent on this

Court, it would not grant the Commonwealth standing. *Texas v. Biden* did not do away with the requirement that a movant produce evidence of impending injury. *Id.* Rather, it found that "big-picture evidence" can establish that injury is certainly impending. *Id.* The Commonwealth did not provide big or small picture *evidence*, it merely submitted a speculative claim that it will "likely" face increased costs. This speculation does not show a "certainly impending" injury. *Clapper*, 568 U.S. at 409.

**3**

Finally, the Commonwealth claims that it will incur compliance costs as a landowner which must comply with the CWA. [R. 10 at 13.] It claims that its projects "are more likely to require permitting" under the Rule, increasing the expense of obtaining permits. *Id.* Like the private-sector plaintiffs' similar allegations, this is too speculative to establish standing. Injury to the Commonwealth's coffers is not "certainly impending." *Clapper*, 568 U.S. at 409. It does not identify any project for which it will need to obtain a permit which it would not have before the Rule. Accordingly, the Commonwealth fails to establish an injury-in-fact.

**C**

Recent developments in Congress underscore the ripeness concerns that this case presents. On March 29, as the Motions were under advisement, Congress passed a resolution overturning the Rule. H.R.J. Res. 27, 118th Congress (2023). The resolution is not final. Next, it will proceed to President Biden, who is expected to veto it. *See* 5 U.S.C. § 801; Kristina Peterson, *Senate Votes to Overturn Biden Clean-Water Rule*, Wall St. J. (Mar. 29, 2023, 6:18 PM), https://www.wsj.com/articles/senate-votes-to-overturn-biden-clean-water-rule-d94e7aeb.

The Rule's propriety is the sort of "abstract question[] of wide public significance" that "other governmental institutions may be more competent to address." *Warth*, 422 U.S. at 500.

19

And they are.  Both chambers of Congress have given their input.  The Executive is expected to weigh in as well.  This dynamic encapsulates the risk that, by ruling on a dispute with "no concrete injury," the Court could "distort the role of the Judiciary in its relationship to the Executive and the Legislature and open the Judiciary to an arguable charge of providing 'government by injunction.'"  *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 222 (1974).

This is not to say that the Plaintiffs would never have standing to litigate the questions they present.  As explained throughout this Order, certain developments, pleadings, or allegations could ripen this matter into a controversy fit for judicial review.  But at this point, the plaintiffs allege only uncertain concerns about the Rule's impact.  Those concerns are improper for this Court to resolve and are better suited for "other governmental institutions."  *Warth*, 422 U.S. at 500.  Fortunately for the Plaintiffs, those institutions are actively engaging in that process.

### D

Having found that the Plaintiffs lack standing, the Court must dismiss this matter for lack of jurisdiction.  Standing is a "bedrock requirement" of the Court's jurisdiction to hear cases under Article III.  *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982).  "Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the case."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 7 Wall. 506, 514 (1868)).  The Defendants do not seek dismissal but "because the standing issue goes to this Court's subject matter jurisdiction, it can be raised *sua sponte*."  *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 607 (6th Cir. 2007).  Having "announced

20

the fact" that the Plaintiffs do not have standing, the Court's "only function remaining" is to dismiss this matter. *Steel Co.*, 523 U.S. at 94. Dismissal will be without prejudice, allowing the Plaintiffs to re-raise their claims if they become ripe.

III

Neither the Commonwealth nor the private-sector plaintiffs' claims are ripe for review. Perhaps they could establish a "sufficiently imminent," "certainly impending" injury once the agencies are enforcing the Rule. But at this point, the claimed financial and sovereignty injuries are too speculative to constitute imminent injuries in fact. Absent a certainly impending injury, the claims are not ripe, the parties do not have standing, and they are unlikely to succeed on the merits of their claim. Accordingly, they are not entitled to a preliminary injunction. And having found that there is no standing, the Court must also dismiss the action.

This case is a compelling example of when a Court may be tempted to skirt standing requirements to reach the merits. It presents important issues, argued by well-qualified lawyers, that any court would be privileged to resolve. But judges are not librarians wandering around the reading rooms looking for a topic that catches their fancy. The Constitution limits their reading list. This dispute is not *yet* a "case or controversy." Therefore, Article III does not permit this Court to resolve it. Recognizing this reality respects "the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government." *Vander Jagt*, 699 F.2d at 1179 (Bork, J., concurring). Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1. The Commonwealth's Motion for Preliminary Injunction **[R. 10]** is **DENIED WITHOUT PREJUDICE**;

2.  The private-sector plaintiffs' Motion for Preliminary Injunction **[R. 18]** is **DENIED WITHOUT PREJUDICE**;

3.  The claims in this matter are **DISMISSED WITHOUT PREJUDICE** for lack of jurisdiction; and,

4.  This matter is **STRICKEN** from the Court's active docket.

This the 31st day of March, 2023.

Gregory F. Van Tatenhove
United States District Judge