No. 23-5343

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

COMMONWEALTH OF KENTUCKY,

Plaintiff-Appellant,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,

Defendants-Appellees.

On Appeal from the United States District Court
for the Eastern District of Kentucky
Case No. 3:23-cv-00007

## BRIEF AMICUS CURIAE OF
## THE NATIONAL FEDERATION OF INDEPENDENT BUSINESS
## SMALL BUSINESS LEGAL CENTER, INC.
## IN SUPPORT OF APPELLANT

Elizabeth Milito
Rob Smith
NFIB SMALL BUSINESS
LEGAL CENTER
555 12th Street, NW
Ste. 1001
Washington, DC 20004
(202) 406-4443
elizabeth.milito@nfib.org
rob.smith@nfib.org

Thomas R. McCarthy
Tiffany H. Bates
Conor D. Woodfin
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22201
(703) 243-9423
tom@consovoymccarthy.com
tiffany@consovoymccarthy.com
conor@consovoymccarthy.com

*Counsel for Amicus Curiae*

## STATEMENT OF THE PARTIES' CONSENT

Amicus has consulted with parties in this case. Appellant does not oppose the filing of this brief. Appellees "consent to [the NFIB Legal Center] filing an amicus brief, so long as it complies with the timeliness and length requirements of Federal Rule of Appellate Procedure 29 and any other applicable rules." This brief is accompanied by a motion to extend the word limit in accordance with Local Rule 27(d)(2).

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTEREST OF AMICUS CURIAE .................................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................. 2

ARGUMENT ......................................................................................................................... 4

    I.    The final rule—like every WOTUS rule before it—imposes steep costs on plaintiffs................................................................................................................ 4

    II.   The final rule will ruin small businesses unless it is enjoined. ...................... 12

CONCLUSION ..................................................................................................................... 14

CERTIFICATE OF COMPLIANCE ............................................................................... 16

CERTIFICATE OF SERVICE ........................................................................................... 16

# TABLE OF AUTHORITIES

## Cases

*Californians for Alternatives to Toxics v. Schneider Dock & Intermodal Facility, Inc.,*
374 F. Supp. 3d 897 (N.D. Cal. 2019) ................................................................. 4

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ................................................................................................. 9

*Cnty. of Maui v. Hawaii Wildlife Fund,*
140 S. Ct. 1462 (2020) ...................................................................................... 4, 5

*FEC v. Cruz,*
142 S. Ct. 1638 (2022) ........................................................................................ 11

*Kentucky v. Biden,*
57 F.4th 545 (6th Cir. 2023) ......................................................................... 9, 11

*Kentucky v. Yellen,*
54 F.4th 325 (6th Cir. 2022) ............................................................................. 11

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) ................................................................................................. 3

*Nat'l Rifle Ass'n of Am. v. Magaw,*
132 F.3d 272 (6th Cir. 1997) .............................................................................. 8

*Rapanos v. United States,*
547 U.S. 715 (2006) ...................................................................................... 4, 5, 6, 7

*Sackett v. EPA,*
566 U.S. 120 (2012) ....................................................................................... 9, 10, 11

*Texas v. EPA,* No. 3:23-cv-17,
2023 WL 2574591 (S.D. Tex. Mar. 19, 2023) ............................................. 2, 14

*U.S. Army Corps of Eng'rs v. Hawkes Co.,*
578 U.S. 590 (2016) ................................................................................................. 9

*United States v. Larkins,*
852 F.2d 189 (6th Cir. 1988) ............................................................................. 14

*United States v. Pozsgai,*
999 F.2d 719 (3d Cir. 1993) ................................................................................. 5

*West Virginia v. EPA,* No. 3:23-cv-32,
2023 WL 2914389 (D.N.D. Apr. 12, 2023) ................................................. 2, 7, 14

## Statutes

28 U.S.C. §2462 ................................................................................................ 11

33 U.S.C. §1311 ................................................................................................ 10

33 U.S.C. §1313 .................................................................................................. 7

33 U.S.C. §1319 ............................................................................................... 4, 5

33 U.S.C. §1342 ................................................................................................ 10

33 U.S.C. §1344 ................................................................................................ 10

## Regulations

40 C.F.R. §130.7 ................................................................................................ 7

40 C.F.R. §19.4 .................................................................................................. 4

Civil Monetary Penalty Inflation Adjustment,
   87 Fed. Reg. 1,676, (Jan. 12, 2022) ............................................................. 4

Revised Definition of "Waters of the United States,"
   88 Fed. Reg. 3,004 (Jan. 18, 2023). ................................................. 6, 8, 10, 13

## Other Authorities

EPA & Dep't of the Army, *Economic Analysis for the Final "Revised Definition of Waters of the United States'" Rule* (Dec. 2022), perma.cc/H9PQ-U8TK ......... 6, 7, 8, 10

Ky. Farm Bureau Fed., *Comment Letter on Revised Definition of "Waters of the United States"* (Feb. 4, 2022), perma.cc/AY7F-GN8T ............................................... 13

NFIB Research Found., *Small Business Problems & Priorities* (2020), perma.cc/YKS9-BW56 ..................................................................................... 12

U.S. Chamber of Commerce, *Comment Letter on Proposed Revised Definition of "Waters of the United States"* (Feb. 7, 2022), perma.cc/G2AQ-3BEZ ............................. 7

U.S. Dep't of Agriculture, *Farm Sector Income & Finances: Highlights from the Farm Income Forecast* (Feb. 7, 2023), perma.cc/V5CG-MXFV ................................. 13

West Virginia Attorney General's Office et al., *Comment Letter on Proposed Revised Definition of "Waters of the United States"* (Feb. 7, 2022), perma.cc/2TPG-DELK ....... 8

## INTEREST OF AMICUS CURIAE

The National Federation of Independent Business Small Business Legal Center, Inc. (NFIB Legal Center) is a nonprofit public interest law firm established to provide legal resources to small businesses, and to be the voice for small businesses in the nation's courts through representation on issues of public interest affecting small businesses.[1] It is an affiliate of the National Federation of Independent Business, Inc. (NFIB), which is the nation's leading small business association. NFIB's mission is to promote and protect the right of its members to own, operate, and grow their businesses. NFIB represents the interests of its members in Washington, D.C., and all 50 states.

Amicus takes interest in this case due to the far-reaching negative impacts of EPA's new final rule redefining "waters of the United States." NFIB represents small businesses in all sectors of the economy, including agricultural industries, home builders, developers, golf course owners, and others that are directly impacted by this rule.

---

[1] No party's counsel authored this brief in whole or in part. No entity or person, aside from Amicus, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

1

## INTRODUCTION AND SUMMARY OF ARGUMENT

The EPA and Army Corps' new final rule redefining "waters of the United States" is already enjoined in twenty-six States. Two district courts have issued reasoned opinions explaining the rule's numerous legal infirmities. *See Texas v. EPA*, No. 3:23-cv-17, 2023 WL 2574591, at \*13 (S.D. Tex. Mar. 19, 2023); *West Virginia v. EPA*, No. 3:23-cv-32, 2023 WL 2914389, at \*26 (D.N.D. Apr. 12, 2023). Both courts concluded that the equities and public interest warrant enjoining the rule until the litigation is resolved. The injunctions were limited, extending relief only to the States in those cases. But while those injunctions do not cover Kentucky, the parties in this case will experience the same harms those plaintiffs would be facing but for judicial intervention.

Steep compliance costs, looming criminal penalties, indeterminate rules, and uncertain enforcement are fixtures of the Clean Water Act. The EPA's new rule does not make that regime any cheaper, easier, or more certain. By expanding the definition of "waters of the United States," the EPA's new rule raises compliance costs, inflates the EPA's jurisdiction, and increases uncertainty for landowners doing their best to avoid hefty civil and criminal sanctions. Given the ever-present costs of the Clean Water Act and the new rule's undisputed expansion of power, the *Texas* and *West Virginia* courts had no difficulty concluding that the States in those cases were entitled to preliminary relief.

In this case, however, the district court ruled that plaintiffs lacked standing. It found that plaintiffs failed to present sufficient evidence of injury. But that ruling

ignores decades of caselaw recognizing the unavoidable financial harm experienced by those regulated by the EPA. And as a matter of public record, the EPA admits that its new rule will expand its jurisdiction and increase compliance costs for landowners such as plaintiffs in this case. There is "ordinarily little question" that plaintiffs have standing to challenge an administrative action when they are "an object of the action (or forgone action) at issue." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). And there is no question at all here.

Moreover, the rule's harsh penalties and non-recoverable compliance costs demonstrate that plaintiffs will suffer irreparable harm absent an injunction. NFIB is attuned to the needs of small businesses, who have growing reason to fear the harsh, unpredictable hand of the EPA. A temporary injunction of the rule will maintain a modicum of predictability for these businesses. And given the Supreme Court's expected decision this summer in *Sackett v. EPA*, No. 21-454, concerns about uncertainty in the regulatory landscape are paramount.

Kentucky's motion and the *Texas* and *West Virginia* opinions explain the many reasons the EPA's new rule is unlawful. This brief further explains why the EPA's enforcement of its new rule will cause irreparable injury to Kentucky, the private plaintiffs, and small businesses across the country. This Court should grant the temporary injunction pending appeal to prevent these harms while the litigation is resolved.

# ARGUMENT

## I.    The final rule—like every WOTUS rule before it—imposes steep costs on plaintiffs.

"'The burden of federal regulation'" under the Clean Water Act "is not trivial." *Rapanos v. United States*, 547 U.S. 715, 721 (2006). Civil, criminal, and administrative penalties loom over those subject to the Act. The civil penalties alone are astronomical. The Act establishes maximum civil penalties "not to exceed $25,000 *per day* for *each violation*." 33 U.S.C. §1319(d) (emphasis added). A farmer reading that section of the Act could be forgiven for thinking $25,000 means $25,000. It doesn't. Invoking "various inflation adjustment statutes," the EPA routinely increases that "maximum" penalty. *Californians for Alternatives to Toxics v. Schneider Dock & Intermodal Facility, Inc.*, 374 F. Supp. 3d 897, 922 n.15 (N.D. Cal. 2019). Just three years ago, "[t]he Act authorize[d] as much as $54,833 in fines per day (or more than $20 million per year)." *Cnty. of Maui v. Haw. Wildlife Fund*, 140 S. Ct. 1462, 1489 (2020) (Alito, J., dissenting). During the comment period of the new rule, the fines had increased to $59,973. *See* Civil Monetary Penalty Inflation Adjustment, 87 Fed. Reg. 1,676, 1,678 (Jan. 12, 2022). That number— for now—is $64,618 per violation, per day. *See* 40 C.F.R. §19.4. "And the availability of citizen suits only exacerbates the danger to ordinary landowners." *Cnty. of Maui*, 140 S. Ct. at 1489 (Alito, J., dissenting).

That's just the civil penalties. The criminal penalties raise the stakes. Negligent criminal violations of the Act are assessed a $2,500 *minimum* fine. 33 U.S.C. §1319(c)(1).

Like the civil penalties, the criminal fines multiply with each violation, and each passing day. *Id.* Negligent violations are punishable by up to a year in prison. *Id.* And a landowner who "knowingly violates" the Act (or "any permit condition or limitation") faces a $50,000 fine per day of violation and up to three years in prison. *Id.* §1319(c)(2). A second conviction doubles the fine and the term of imprisonment. *Id.*

The penalties accumulate rapidly. John Rapanos, for example, faced over five years in prison and "hundreds of thousands of dollars in criminal and civil fines" for backfilling his own land. *Rapanos*, 547 U.S. at 721. What's worse, "the consequences to landowners even for inadvertent violations can be crushing." *Cnty. of Maui*, 140 S. Ct. at 1489 (Alito, J., dissenting) (citation omitted). "Unpermitted discharge is the archetypal Clean Water Act violation, and subjects the discharger to strict liability." *United States v. Pozsgai*, 999 F.2d 719, 725 (3d Cir. 1993) (citing 33 U.S.C. §1311(a)). Ordinary landowners are often unaware that they need to obtain a permit to maintain their own land until the EPA slams them with civil and criminal enforcement proceedings. And because of the strict liability regime, they have no choice but to pay the fines they never even knew were accumulating. *See Cnty. of Maui*, 140 S. Ct. at 1489 (Alito, J., dissenting) (citing 33 U.S.C. §§1311, 1342, 1344).

The sophisticated landowner who manages to avoid these penalties does so at a steep cost. Landowners spend billions of dollars each year just on figuring out whether permits are required and obtaining those permits. *Rapanos*, 547 U.S. at 721. When the Supreme Court decided *Rapanos* nearly two decades ago, "[t]he average applicant for an

individual permit spen[t] 788 days and $271,596 in completing the process, and the average applicant for a nationwide permit spen[t] 313 days and $28,915—not counting costs of mitigation or design changes." *Id.* And due to the stiff civil and criminal penalties, the costs of compliance "on a broad range of ordinary industrial and commercial activities" "cannot be avoided." *Id.* (quoting *Hanousek v. United States*, 528 U.S. 1102, 1103 (2000) (Thomas, J., dissenting from denial of certiorari)).

The EPA's new rule does not make this regime any cheaper or any easier. Indeed, the EPA's own economic analysis of the rule confirms that compliance is as unavoidable as it always has been, and even more expensive. The EPA estimated the new rule could raise compliance costs by up to $568.7 million per year *over the 2020 regime. See* EPA & Dep't of the Army, *Economic Analysis for the Final "Revised Definition of 'Waters of the United States'" Rule* 89 (Dec. 2022), perma.cc/H9PQ-U8TK. And the EPA admits that prediction underestimates the increase in costs because it doesn't account for the costs of avoidance and minimization. *See id.* In the final rule, the EPA "acknowledge[d]" that its mandate for "case-specific analyses" will "potentially rais[e] timeliness and consistency issues that the agencies' rules in 2015 and 2020 were designed, in part, to reduce." Revised Definition of "Waters of the United States," 88 Fed. Reg. 3,004, 3,047 (Jan. 18, 2023).

But avoidance and minimization are significant drivers of compliance costs. Take just one example of costs the EPA failed to evaluate. The EPA admitted that the new rule's "shift towards more [approved jurisdictional determinations] can increase costs

and construction delays." Economic Analysis, *supra*, at 91. According to the Chamber of Commerce, "[p]re-construction delays due to a protracted permitting process can add tens of thousands to millions of dollars to a project's bottom line and can even block important climate, clean energy, resilience, and water management projects from proceeding." U.S. Chamber of Commerce, *Comment Letter on Proposed Revised Definition of "Waters of the United States"* 1 (Feb. 7, 2022), perma.cc/G2AQ-3BEZ. That's potentially millions of dollars in compliance costs for one project in one industry. And the EPA admitted those costs will increase. The EPA and regulated landowners might not know the precise value of these costs yet. Given the rule's uncertainty, who could? But years of caselaw and history confirm that those costs are exorbitant and "cannot be avoided." *Rapanos*, 547 U.S. at 721.

These increasing, unavoidable costs will fall on plaintiffs. The private plaintiffs will need to hire consultants, apply for permits, and spend additional money on projects affected by the rule. *See* Op. & Order, R.51, Page ID# 2127-29. Some of those projects are already underway. *See id.* at 10-11. As the EPA's own economic analysis and rulemaking indicate, the rule "will require States, landowners, and countless other effected parties to undertake expensive compliance efforts when their property may implicate navigable waters in ill-defined ways." *West Virginia v. EPA*, 2023 WL 2914389, at *13.

Kentucky will face additional compliance costs. The Clean Water Act requires States to monitor their waters. *See* 33 U.S.C. §1313(c); 40 C.F.R. §130.7. Kentucky—no

less than other States—has waters subject to the Act. *See* West Virginia Attorney General's Office et al., *Comment Letter on Proposed Revised Definition of "Waters of the United States"* 1 (Feb. 7, 2022), perma.cc/2TPG-DELK.[2] The EPA admitted in the final rule "that compared to the 2020 [Navigable Waters Protection Rule], this [final rule] would define more waters as within the scope of the Clean Water Act." 88 Fed. Reg. at 3,139l; *see also* Economic Analysis, *supra*, at 91. Hence, under the new rule, Kentucky must monitor more waters. And that means Kentucky must spend more money monitoring more waters. "When a statute creates substantial economic burdens and compliance is coerced by the threat of enforcement, … it is sufficient for the plaintiff to demonstrate the statute's direct and immediate impact … and to establish that compliance with the regulation imposed will cause significant economic harm." *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 290 (6th Cir. 1997). The district court did not discuss these monitoring costs even though the final rule itself indicates they will increase.

Instead, the district court faulted plaintiffs for not knowing the precise measure of their injuries. The court said it "has 'no idea whether or when' the rule will change how the [Clean Water Act] applies to any particular [plaintiff] because they do not identify any specific water feature or related project and explain how the rule will affect

---

[2] West Virginia submitted this comment on behalf of itself and twenty-three other States, detailing the effects of the new rule on Alabama, Arizona, Arkansas, Georgia, Idaho, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, New Hampshire, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, and Wyoming.

it." Op. & Order, R.51, Page ID# 2127-29 (quoting *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 163 (1967)). Even if the Court's analysis of the record is correct, "the peculiarity and size of a harm affects its *weight* in the equitable balance, not whether it should enter the calculus at all." *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023) (emphasis added). What matters—and what the EPA has admitted in its rulemaking— is that compliance costs will increase. And because plaintiffs have shown they will continue to face compliance costs, they have demonstrated "certainly impending injuries" that entitle them to relief. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

In any event, to the extent plaintiffs are uncertain about the magnitude of their injuries, that uncertainty is attributable to the rule itself. The EPA's jurisdiction under the Clean Water Act "is 'notoriously unclear' and the consequences to landowners even for inadvertent violations can be crushing." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 602 (2016) (Kennedy, J., concurring). Far from being a reason that plaintiffs haven't shown harm, the rule's uncertainty is *a cause of* the harm. "[T]he combination of the uncertain reach of the Clean Water Act and the draconian penalties" is the reason plaintiffs are challenging the rule. *Sackett v. EPA*, 566 U.S. 120, 132 (2012) (Alito, J., concurring).

The district court said plaintiffs must wait until they are "already subjected" to the rule before they can challenge it. Op. & Order, R.51, Page ID# 2131. But they are "already subjected" to the requirement to obtain permits for land falling under the

EPA's jurisdiction. "[M]any jurisdictional determinations concerning wetlands can only be made on a case-by-case basis by EPA field staff," which means that landowners often can't know whether they need a permit until the Army Corps tells them. *Sackett*, 566 U.S. at 133 (Alito, J., concurring). Those case-by-case jurisdictional determinations are time consuming, expensive, and unavoidable. Economic Analysis, *supra*, at 91. And the EPA admits its new rule will increase the number of case-by-case determinations, which will increase uncertainty over its jurisdiction. The 2015 rule had "eliminated the need for extensive case-by-case jurisdictional determinations." 88 Fed. Reg. at 3054-55. The new rule repeals the 2015 categorical rules in favor of "case-specific application of the significant nexus standard or the relatively permanent standard." *Id.* at 3055. Those case-by-case determinations of the EPA's jurisdiction will apply to four of the five categories of water. *Id.* And the strict liability regime under the Act means that once the EPA makes those determinations, it is too late for the landowner. *See* 33 U.S.C. §§1311, 1342, 1344.

The government made this point in the motion for clarification it filed with the Court last week: "[I]t is vital that all members of the public know unequivocally which law governs their own conduct." Doc. 10 at 2. A recurring problem with the Clean Water Act is that landowners don't know if or when they need a permit for their activity. So they "spend time and money" trying to figure that out—hiring consultants, lawyers, and experts to examine their land. *See* No. 23-5345, Doc. 9 at 11. The district court thought these were voluntary costs associated with "determining whether [plaintiffs]

needed to comply with the mandate" and were not "the sort of compliance costs which the cases contemplate as establishing standing." Op. & Order, R.51, Page ID# 2133-34. But "an injury resulting from the application or threatened application of an unlawful enactment remains fairly traceable to such application, even if the injury could be described in some sense as willingly incurred." *FEC v. Cruz*, 142 S. Ct. 1638, 1647 (2022); *accord Kentucky v. Yellen*, 54 F.4th 325, 343 (6th Cir. 2022) (holding that "Tennessee's expenditure of … resources," taken to "maintain compliance" with the rule "and stave off" enforcement action was an injury in fact fairly traceable to the challenged rule). And these compliance costs are not "willingly incurred." To a landowner uncertain about his status in the face of strict liability and "draconian" penalties, those costs are not optional. *Sackett*, 566 U.S. at 132 (Alito, J., concurring).

Plaintiffs' compliance costs, incurred to avoid drowning in civil and criminal penalties, confirm they have standing. They also confirm plaintiffs will suffer irreparable injury absent a temporary injunction. If plaintiffs don't comply with the rule, they expose themselves to the arsenal of penalties the EPA has at its disposal. The five-year statute of limitations is cold comfort to those wondering when the EPA will turn its gaze to their land. *See* 28 U.S.C. §2462. If they do comply with the rule, they will need to hire experts, conduct surveys, buy permits, and "dance to the EPA's tune." *Sackett*, 566 U.S. at 132 (Alito, J., concurring). Those exorbitant costs are unavoidable. And "[d]ue to the federal government's sovereign immunity," any money plaintiffs hand over to the EPA is "unrecoverable." *Kentucky v. Biden*, 57 F.4th at 556. That "makes

monetary losses like these irreparable." *Id.* Plaintiffs face irreparable harm wherever they turn. A temporary injunction is their last resort to mitigate those harms, at least during this appeal.

## II.    The final rule will ruin small businesses unless it is enjoined.

The rule's devastation won't stop with the parties in this suit. The costs described above will be ruinous for small businesses. Increased permitting, work delays, compliance and mitigation efforts, and business operational expenses will thrust small landowners into financial insecurity.

Every four years, NFIB surveys small businesses about the most important obstacles hindering their success. In 2020, small businesses ranked "Unreasonable Government Regulations" such as those enforced by the EPA as the sixth most pressing problem for their business (out of seventy-five). NFIB Research Found., *Small Business Problems & Priorities* 9 (2020), perma.cc/YKS9-BW56. Nearly 20% labeled it a "critical" concern. *Id.* "Uncertainty over Government Actions" (such as when an agency publishes a rule that will likely conflict with a forthcoming Supreme Court decision) ranked in the top ten. *Id.* For the agricultural industry, "Environmental Regulations" ranked as the seventh most pressing problem, with 21% labeling it "critical." *Id.* at 56. Agricultural businesses also indicated that land-use regulations were far more burdensome than their counterparts in other industries. *Id.* The EPA's new rule will exacerbate these obstacles for small businesses.

The rule will hit farmers hard. The Department of Agriculture forecasts that net farm income, a broad measure of profits, will fall by $25.9 billion in 2023. *See* U.S. Dep't of Agriculture, *Farm Sector Income & Finances: Highlights from the Farm Income Forecast* (Feb. 7, 2023), perma.cc/V5CG-MXFV. That's a 16 percent drop from last year's profits. *Id.* And the Department predicts that median farm income earned by farm households in 2022 will fall from $210 to -$683. *Id.* It is "then forecast to decline further to -$1,125 in 2023." *Id.* The EPA could not have adopted the rule at a worse time.

"Farming is a necessarily water-dependent enterprise." Ky. Farm Bureau Fed., *Comment Letter on Revised Definition of "Waters of the United States,"* 2 (Feb. 4, 2022), perma.cc/AY7F-GN8T. The final rule's expanding definitions thus sweep more and more farming activities under the EPA's jurisdiction. For example, the final rule expands the definition of "tributary" and removes the 2020 rule's exclusion of ephemeral and intermittent streams. 88 Fed. Reg. at 3080-81. Because "it would be extremely difficult to avoid entirely the small wetlands, ephemeral drainages, and ditches in and around farm fields when applying crop protection products and fertilizer," the new rule will require farmers to seek permits to perform routine work on their land. *See Ky. Farm Bureau Fed. Comment*, *supra*, at 2-3. And the uncertainty of the definitions means the farmers will have to rely on the EPA's individual determinations about whether they need to seek a permit, and what they can do with their land. *Id.* at 3-4. That process is "tortuous and costly," particularly for the "[m]any family and small business farm

owners [who] can ill afford the tens of thousands of dollars in additional costs for federal permitting of ordinary farming activities." *Id.*

"The framers of the Constitution were solicitous of the rights of landowners—especially small farmers struggling for survival." *United States v. Larkins*, 852 F.2d 189, 194 (6th Cir. 1988) (Merritt, J., concurring). And the small-time farmers' struggle with the EPA illustrates the difficulties of just one segment of Americans. The rule reaches ranchers, home builders, fishers, golf course owners, miners, sportsmen, foresters, and outfitters—to name a few. Large-scale financial impacts are a certainty when the EPA expands its authority over waters of the United States. The balance of the equities and public interest thus favor an injunction that maintains the status quo for this appeal. That is why two courts have already enjoined the EPA's final rule in twenty-six states. *See Texas v. EPA*, 2023 WL 2574591, at *13; *West Virginia v. EPA*, 2023 WL 2914389, at *26.

## CONCLUSION

The Court should grant the emergency motions for a preliminary injunction pending appeal.

14

Respectfully submitted,

*/s/ Thomas R. McCarthy*

<div style="display: flex;">
<div>

Elizabeth Milito
Rob Smith
NFIB SMALL BUSINESS
LEGAL CENTER
555 12th Street, NW
Ste. 1001
Washington, DC 20004
(202) 406-4443
elizabeth.milito@nfib.org
rob.smith@nfib.org

</div>
<div>

Thomas R. McCarthy
Tiffany H. Bates
Conor D. Woodfin
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22201
(703) 243-9423
tom@consovoymccarthy.com
tiffany@consovoymccarthy.com
conor@consovoymccarthy.com

</div>
</div>

*Counsel for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE**

This brief is accompanied by a motion for leave to file an oversize brief. The word limit for amicus briefs in support of a motion is 2,600 words. *See* Local Rules 27(d)(2)(A), 32(a)(7)(B). This brief contains 3,626 words, excluding the parts that can be excluded under the rules. This brief complies with Rule 32(a)(5)-(6) because it was prepared using Microsoft Word in 14-point Garamond font.

 */s/ Thomas R. McCarthy*
Counsel for Amicus
Dated: April 26, 2023

**CERTIFICATE OF SERVICE**

I filed this brief via ECF, which will email everyone requiring notice.

 */s/ Thomas R. McCarthy*
Counsel for Amicus
Dated: April 26, 2023